S. K. McILHENNY, ADMINISTRATOR, AND THE UNION TRUST
COMPANY v. JACOB BINZ ET AL.

No. 2849.

1. **Appointment of Receiver of Corporation on Its own Petition.**—The railway company first filed its bill alleging its inability to pay its debts and to operate its road, and prayed that it might be sold and its proceeds distributed, etc. Upon the propriety of such suit we are not called upon to pass. But we are unwilling to leave the subject without remark, lest it should be inferred that the appointment of the receiver of the corporation upon its own petition merits the approval of the court. The facts authorizing it, the directors or trustees for the stockholders and creditors would be the proper parties to institute the suit.

2. **Same—Proceedings Ordering Sale.**—But if such appointment of a receiver was erroneous, yet the proceedings of the court consequent upon that appointment were not void. We also think that since the report of the master and the evidence adduced upon the trial show that the appellant railway company was hopelessly insolvent, it was not injured by the action of the court in foreclosing the mortgages given by it.

3. **Right to Order of Foreclosure—Practice in Receivership Matters.**—The original petition showed the company was unable to meet its obligations and operate its road. The supplemental petition averred expressly its insolvency. When the Trust Company made itself a party to the suit the court had the entire property of the insolvent corporation in the hands of its receiver and all the creditors before it, and properly treated the assets as a trust fund for distribution among such creditors according to their respective priorities and liens. At that time default had been made in the payment of interest upon both the first and the second mortgage bonds represented by the Trust Company, and by the terms of the second mortgage bonds they became due upon such failure. Under such circumstances it would have been anomalous to decree a sale of property of the company subject to the first mortgage. The first mortgage only provided for foreclosure after maturity in 1898.

4. **Authority of Counsel.**—The authority of the attorneys who signed and filed the pleadings, acted upon in the court below, can not be questioned for the first time on appeal. To rid itself of the pleading it was only necessary for the company to dismiss its original counsel and withdraw the pleading about which complaint is made.

5. **Order for Sale by Receiver Prescribing a Minimum Bid.** — It was not error in the decree ordering sale of the railway to prescribe that it should not be sold at a less price than one named in the decree. This may have been necessary to prevent sacrifice. Nor was it error to provide that the proceeds of sale, after the expenses of the receivership, costs of court and of foreclosure, and such claims as had been accorded priority, should be paid on the first mortgage bonds.

Vol. LXXX—1

6. ·Attacking Records of a Corporation.—The execution of the bonds in controversy being in issue the holder produced a book identified by the secretary of the railway company making the bonds as "the book in which the records of the meetings of the directors and stockholders were kept," etc. It was then proposed to prove by the secretary that he had written *the proceedings* at the dictation of Paul Bremond, the president, etc., and long after their dates, and although the records show meetings from time to time witness believed no such meetings were held. This was excluded, and the exclusion is approved:

1. The company in attempting to destroy the effect of its records should produce more conclusive testimony.

2. It seems that both the administrator of Bremond and the railway company would be estopped to deny the validity of the mortgages ordered and evidenced by the records.

7. New Matter in Pleading—Intervention May be Denied.—In original petition parties joined as plaintiffs as heirs .and devisees of Paul Bremond, owner of all the stock of the railway company. At the.time of the trial these parties by amended petition set up claim to one half the railway, upon the alleged facts that Paul Bremond had used in the construction, etc., of the railway the community property of himself and his deceased wife, through whom they claim as her heirs; also attacking the alleged incorporation and its records as fictitious and in fraud of their rights as heirs of Mrs. Bremond. This amended petition introduced a new and distinct cause of action and was an abandonment of the first, and was calculated to protract ·the litigation. It was properly treated as an original plea in intervention filed on the eve ·of trial. The court's action in sustaining exceptions to it and dismissing it without prejudice approved.

8. Description.—A mortgage was executed January, 1883. As an exhibit a list ·of lands was appended December, 1884. Evidently in order to remedy defects in the first mortgage the corporation executed a second mortgage slightly different in the extent of property included. This in no way referred to the first mortgage. While reference is made in it to *exhibits* as containing lists, etc., no exhibits were attached. The lands were described as follows: "Seventy-five thousand acres of land or more owned by said railway company and lying contiguous to said trunk line and its authorized branches, the larger portion whereof being heavily timbered, and also such as may be acquired by·said company in any county through or into which said trunk line or any of its branches are now or may hereafter be constructed; and any and all land which said company may hereafter acquire in east and northeast Texas, in the section of country bordering on or adjacent to its trunk line and authorized branches; and also the blocks and lots laid off and designed in the town sites of said railway, and also the town lots situated in the city of Houston, Harris County, Texas, schedules of which lands and town lots and blocks are attached." *Held,* that the trial court correctly decided that the lands and town lots in question were not described in the said second mortgage.

9. Privileged Liens Upon Railway. — Creditors who have labored, furnished supplies, made repairs or useful improvements in the operation, maintenance and betterment of the railway, and who have been suddenly deprived of their remedies at law by the appointment of a receiver, are entitled to the equitable consideration of the court in the distribution of the assets of the company, and to priority in payment from the net income of the property while in the hands of the court.

10. Operating Expenses.—As to what are called operating expenses there is no difficulty, and so much is conceded in this case.

11. Same—Claims Upon Net Earnings.—It has been held that claims for construction, unless the work was done or the material furnished in pursuance of an order of the court, can not be allowed priority. But we think there may be construction

claims which appeal as strongly to the conscience of a court of equity as the debts which are commonly known as operating expenses.

12.  **Useful Improvements—Construction Claims.**—When mortgages are executed upon an unfinished road and they show upon their face that it was contemplated that the work of construction should be prosecuted to completion, and when the mortgages attach to the new road as fast as it is finished, we are of opinion that the new road should be considered "a useful improvement," and that if the road be put into the hands of a receiver before the work and materials are paid for the holders of the claims for such work and material should be paid from the net earnings of the road while under control of the court.

13.  **Diversion of Net Earnings.**—In this case net earnings sufficient to pay all the preferred claims were appropriated to betterments upon the road, and to the payment of interest upon the bonds.  This diversion was in derogation of the rights of those entitled to the fund.  It was proper that the money be restored or provided for in the order of sale of the road.

14.  **Statutory Liens—Laborers and Material Men.**—Claims were ascertained to be for labor performed in the construction, operation, and maintenance of the railway within twelve months before the appointment of the receiver.  The mere fact that they did not accrue within·six months next preceding the appointment does not deprive the owners of the claims of the statutory lien, enforcement of which was interfered with by the receivership proceedings.

15.  **Provisional Orders.** — The order of the court prescribing six months as the limit beyond which the right to payment out of the earnings by the receiver was fixed, was but provisional, and could not preclude the court from properly adjusting priority of the several claims as law and equity might demand.

16.  **Board of Employes Detained out of Wages.**—By arrangement with employes a sufficiency of their wages was detained to pay their board, to be paid to boarding house keepers and grocers.  These claims were of like dignity as if in hands of the laborers, and the change in form or the assignment of the claims did not affect their standing or securities.

17.  **Taking Additional Security Not a Waiver.**—The holder of some of these claims took for them the notes of the railway company indorsed by Paul Bremond. The special master found that thereby it was not intended to waive any right of priority.  *Held*, such change of form and additional security when otherwise intended was not a waiver of any right of priority.

18.  **Money Loaned on Imperfect Lien upon Earnings.**—Binz loaned money to the railway company which was used in payment of interest on its bonds.  He was secured by three promissory notes reciting:  "Secured by a pledge of three-fourths of the gross earnings of the road."  This stipulation had no legal effect touching the disposition of the earnings of the road when in hands of the receiver.

19.  **Operating Expenses — Furnishing Coal.** — Milby & Dow held two claims against the railway company which were for coal furnished for operating its road, one of date December, 1884, and the other January, 1885; the one a little more and the other a little less than six months prior to the appointment of the receiver.  There was no circumstance disclosed showing laches as to the one claim more than as to the other. The rejection of priority therefore to the older claim was improper.

APPEAL from Harris.   Tried below before Hon. James Masterson. The opinion gives a sufficient statement.

*Hutcheson, Carrington & Sears,* for S. K. McIlhenny, administrator, and for the Houston East & West Texas Railway Company.

*Wheeler H. Peckham, Baker, Botts & Baker,* and *Gresham & Jones,* for appellant Union Trust Company of New York.

*F. F. Chew,* for Houston East & West Texas Railway Company.

*McLemore & Campbell* and *Jones & Garnett,* for Jacob Binz, Jacob Hornberger, A. Blau, Cary, Ogden & Parker, R. M. McManus, J. A. Ewing & Co., I. Heidenheimer, F. L. Johnson, Neil MacDonald, T. J. Todd, Henry S. Fox, John Maher, appellees.

*Houston Bros.,* for Johnson & Hanson.

*Wm. H. Crank,* for appellees The Dixon Manufacturing Company and F. Rohde.

*O. T. Holt* and *Gustave Cook,* for appellees John A. and Pauline Dozier, J. C. and Kate Zimmer, Walter E. and Nettie Lufkin, and Julia Bremond.

*John G. Todd,* for appellees Milby & Dow.

GAINES, ASSOCIATE JUSTICE.—This suit was originally instituted by the Houston East & West Texas Railway Company and Mary Louise Bremond, Edward L. Bremond, Harriet Timpson, John A. Dozier and his wife, Mary Pauline Dozier, Kate Bremond, Walter E. Lufkin and his wife, Henrietta C. Lufkin, and Julia Bremond, a minor, against T. W. House and other creditors of the company.

The petition alleges that the company was incorporated by an act of the Legislature of Texas, approved March 11, 1875; that Paul Bremond had died shortly before the institution of the suit, being the owner of the whole of the stock, and that the co-plaintiffs of the corporation, except John A. Dozier and Walter E. Lufkin, were his devisees, legatees, and heirs at law. The petition also averred that the corporation was largely indebted both to secured and unsecured creditors, and that it was unable to meet its obligations. It was further alleged that certain unsecured creditors had prosecuted their demands to judgment and had caused executions to issue thereon and to be levied upon the rolling stock of the company, and that such rolling stock was under mortgage to secure the outstanding bonds of the company and was necessary to enable it to operate its road and to perform its duties to the State and the people. The prayer was for the appointment of a receiver to take charge of the assets of the corporation, and that upon final hearing its franchise and property be sold as an entirety, and that the proceeds of the sale be distributed among its creditors according to their respective rights, equities, and priorities, and the balance among the stockhold-

ers. At the time of the filing of the petition neither an executor of the will of Paul Bremond, deceased, nor an administrator of his estate had been appointed.

The subsequent history of the suit is fully detailed in the brief of the appellant, the Union Trust Company, and from that brief we make up the following summary of the proceedings.

The petition having been filed on the 7th of July, 1885, on the next day the court made an order appointing a receiver and directing that "all debts of said railway company for work and labor performed by its employes and laborers, and for supplies and materials furnished for equipping, operating, repairing or improving the road, and all obligations incurred in the transportation of the passengers and freights, or for injuries to persons or property, which have accrued within six months last past shall be paid out of the earnings of the road as may be hereafter ordered."

A special master in chancery was appointed in the same order, with the powers usually incident to that position.

Soon after this original bill was filed, the defendants Jacob Hornberger, Johnson & Hansen, Jacob Binz, and T. J. Todd filed their answers to said original bill, setting up the company's indebtedness to them, all of which their pleadings show accrued after the date of the first mortgage and most of it after the date of the second mortgage, and claiming what they call an equitable lien on the company's property to secure their debts.

Afterward, and before the Union Trust Company of New York became a party to the suit, by answer and cross-bill most of the creditors of said railway company intervened in said suit and their debts were referred to the special master, who very uniformly reported most of the claims as entitled to priority of payment.

On the 2d day of December, 1887, the Union Trust Company as trustee in the two mortgages intended to secure the bonds of the company, obtained leave of the court to make itself a party to the suit, and on the 5th day of March, 1888, filed its answer to the original bill and also filed a cross-bill seeking to foreclose the mortgages. To this cross-bill the railway company filed an answer attacking the validity of the mortgages. On the 26th of April, 1889, S. D. McIlhenny, as administrator of the estate of Paul Bremond and the railway company, filed a joint answer to the Union Trust Company's cross-bill, which among other things denied that the mortgages were issued in the manner authorized by law.

On October 7, 1889, the children and heirs of Paul Bremond, who were co-plaintiffs with said railway company in the original petition filed in this cause, and therein claimed that their father owned the entire capital stock of said company, and the same had descended and passed to them as his devisees, legatees, and heirs at law, filed their

amended petition attacking said mortgages and denying that said railway company was ever organized, claimed that their father falsely and fraudulently assumed to have organized the company under said act, and then spent in the construction of said road the community fund of himself and his deceased wife, and claimed one-half of said road through their deceased mother. ˙ They prayed for partition, and in the event this relief could not be had that the road be sold, and that one-half of the proceeds be paid to them.   To this a demurrer was sustained.

On the 23d of April, 1889, the special master made a report of all the claims against the company which had been presented, including those of the Union Trust Company.   At the Fall Term, 1889, of the court the cause came on for trial, and by consent was submitted to the court without a jury as to all the issues presented, except the plea of *non est factum* to the mortgages.   The issues made by these pleas were tried before a jury, who returned a verdict in favor of the Union Trust Company.   The court thereupon rendered a decree ordering a sale of the property of the company including its franchises as an entirety, and ranking certain of its debts into three classes, denominated respectively as "statutory claims," "operating expenses," and "construction claims," and directing that from the proceeds of the sale these claims so classified should be first paid; that then the mortgage bonds should be next paid, and that the balance should be distributed among the general creditors.   Such are the salient features of the decree. The details and other particulars need not be stated in this connection.

From the judgment the railway company, S. D. McIlhenny, administrator, and the Trust Company have appealed.   The heirs of Mary Bremond and Milby & Dow, intervening creditors, have filed cross-assignments of error, which are properly presented in briefs on file.

The appellant the Houston East & West Texas Railway Company complains that the court erred in decreeing a foreclosure of the first mortgage and in decreeing a sale of the properties of the railway company to pay the bonds secured by that mortgage.   It is insisted that so much of the decree is erroneous, "because by the terms of said mortgage it is provided that such foreclosure and sale can only be decreed in case default shall be made in the principal sum or sums by virtue of the said bonds or any of them, or any part thereof, at maturity, and no part of said bonds mature or become payable until the first day of May, A. D. 1898 (eighteen hundred and ninety-eight)."

· The contention seems to be that since the mortgage was not subject to foreclosure for default in the payment of the interest on the bonds only, and since the principal was not due, the property of the corporation should have been sold subject to the mortgage.   It may be that according to the terms of the mortgage the trustee was not entitled as an original proceeding to have a foreclosure and sale.   But the cross-action of the Union Trust Company is not to be treated as such a proceeding.

The railway company first filed its bill alleging its inability to pay its debts and to operate its road, and prayed that it might be sold and its proceeds distributed among its creditors according to their respective priorities. Upon the propriety of such suit we are not called upon to pass. The only assignment in any of the numerous briefs on file which presents that question has been expressly abandoned. But we are unwilling to leave the subject without remark lest it should be inferred that the appointment of the receiver for the property of the corporation upon its own petition merits the approval of this court. The case of the Wabash, etc., Railway Co. v. Central Trust Co., 22 Fed. Rep., 272, in a Circuit Court of the United States, is the only precedent we have found for this practice. On the other hand there are authorities which hold that a receiver should not be appointed to take charge of the assets of a corporation upon its own original proceedings. (Kimball v. Goodburn, 32 Mich., 10; Hugh v. McCrae, Chase's Dec., 467.) A natural person, because of his inability to meet the demands of his creditors, has no right to place his property under the control of a court of equity for the purpose merely of preventing its sacrifice by its sale under execution. We see no reason why as a general rule a corporation does not stand upon the same footing. If a railway corporation become insolvent and a receivership be necessary for the preservation of its property and the distribution of its assets among its creditors, it would seem that the directors as trustees for the stockholders and creditors would be the proper parties to institute the suit.

But if the appointment of the receiver were erroneous, we are of the opinion that the proceedings of the court consequent upon that appointment were not void; and that of all parties in interest in the subject matter of the litigation the original plaintiffs have the least right to complain of the consequences of that action. We also think that since the report of the master and the evidence adduced upon the trial show that the appellant railway company was hopelessly insolvent, it was not injured by the action of the court in foreclosing the mortgages. If any harm has resulted from the decree in this particular it has occurred to parties who do not here complain of that ruling. We might rest our decision upon the question presented by the assignment of error under consideration upon this ground alone. But we are of the opinion that the court did not err in foreclosing the mortgages. The original petition alleged a state of facts which showed the company was unable to meet its obligations and operate its road, and the supplemental petition averred expressly its insolvency. When the Trust Company made itself a party to the suit the court had the entire property of the insolvent corporation in the hands of its receiver and all creditors before it, and properly treated the assets as a trust fund for distribution among such creditors according to their respective priorities and liens. At that time default had been made in the payment of interest upon both

the first and the second mortgage bonds, and by the terms of the latter mortgage the bonds secured by it had become due. Under such circumstances we think it would have been anomalous to decree a sale of property of the company subject to the first mortgage as this appellant contends should have been done. It may be that if the company had remained solvent under the stipulations in the first mortgage the Trust Company would have had no right to a foreclosure, although default had been made in the payment of the interest on the bonds secured by it.

The appellant railway company also complains that the court erred in treating a pleading filed in the cause and styled an "amendment and supplement" to the original petition as its pleading and in entering judgment *pro confesso* upon it. One of the grounds of objection to the action of the court is that the amended petition was not signed by the attorneys of the company. It is claimed that the attorneys who filed the pleading were the attorneys of the receivers and had ceased to represent the railway company. We need not inquire into the propriety of the practice of permitting the attorneys of the plaintiffs in a suit of this character to act at the same time as attorneys for the receiver. The name of one of the attorneys in the original petition was signed to the amendment. If the pleading was filed without the authority of the plaintiff company, and if it desired to strike it out, action should have been taken in the lower court to accomplish that end. The question of the authority of the attorneys who signed and filed the pleading can not be raised for the first time in this court. To rid itself of the pleading it was only necessary for the company to dismiss its original counsel and to withdraw the amendment.

There was no error in so much of the final decree as directed that the property of the insolvent corporation when offered for sale to the highest bidder should not be "knocked off" for a less sum than $1,200,000. We think the court had the power to make such an order and that the power was properly exercised in order to prevent a sacrifice of the property. There is no reason why after receiving enough cash to meet the expenses of the receivership, the costs of court, and of the foreclosure and the payment of such claims as had been awarded priority over the mortgage debts, the balance should not be paid in on the first mortgage bonds.

During the progress of the trial and after the secretary of the railway company had testified that a certain book identified by witness was the book in which the records of the meetings of the directors and stockholders were kept, and that he found the book in the office when he became secretary, and that it was the only book that had been recognized as such, the Union Trust Company offered in evidence from that book what purported to be a record of the proceedings of the board of directors and of a meeting of the stockholders authorizing the execution of

the bonds and of the first mortgage to secure the same. The railway company and McIlhenny, administrator, in support of their plea of *non est factum,* then proposed to prove by John Dozier the following facts:

"In 1881 witness came into the company as its bookkeeper and to do almost any work imposed on him. There was at that time no minute book of the company; he had knowledge of this. The witness had theretofore, from 1875, been the clerk of the City Bank of Houston, and the railway had no clerk; he didn't know anything of it; that he then wrote up from scraps furnished him by Mr. Bremond, the president, and dictated to him the minutes which were found in the present purported minute book, and though they were dated, a great many of them, in 1875, 1876, and 1877, and on up to 1881, yet he in fact wrote them there himself from such memorandum and dictation as the president of the road, Mr. Bremond, furnished him, yet he is satisfied that there were no such meetings held, or he would have known at the time they were held, and that he did not know of any such, though he was Bremond's son-in-law; that he does not know of but one genuine mortgage meeting which was held, and that was the one which provided for the call of the stockholders' meeting on December 4, 1884, and the stockholders' meeting held at that time, and which then sought to ratify the execution of the bonds and mortgages of the road; that this meeting was in fact held; that he believes and thinks he had an opportunity to know that what he believes—that the balance never in fact took place."

The Trust Company objected to the testimony and it was excluded by the court. The ruling of the court was correct. When a corporation seeks to destroy the effect of entries upon its books which purport to be regular records of the proceedings of its board of directors or stockholders, it should offer for that purpose testimony of a more conclusive nature than that which was offered in this case. The testimony of the witness would have served merely to create a suspicion that there was an irregularity in the manner in which the records of the company were kept. If the evidence had been more conclusive in its nature and tendency it would have still been questionable whether under the circumstances of this case both the company itself and the administrator of Bremond should not be held estopped to deny the validity of the mortgages.

The execution of the first mortgage was proved *prima facie* by the evidence introduced by the Trust Company, and there being no evidence to the contrary the court did not err in instructing the jury to find for that company on the issue made by the plea of *non est factum.*

What has been said disposes of all the questions raised by the Houston East & West Texas Railway Company and of all the assignments presented by McIlhenny, administrator, except one. That assignment complains that the court erred in sustaining the demurrer of the Trust

Company to a portion of the answer and cross-bill of the administrator of Paul Bremond's estate. We are not cited to the page in the transcript which contains the ruling complained of, and after a careful examination we are satisfied that the record does not contain the order.

In logical order the cross-assignment of error of the heirs of Mrs. Mary Bremond, the deceased wife of Paul Bremond, comes next for consideration. They are Pauline Dozier, wife of John A. Dozier, Kate Zimmer, wife of J. C. Zimmer, Nettie Lufkin, wife of Walter E. Lufkin, and Pauline Bremond; and they in connection with others were parties plaintiffs in the original petition as heirs and legatees of Paul Bremond, deceased. At the term of the court at which the case was tried the parties named, the married women being joined by their husbands, filed an amended original petition in lieu of their original petition. For the purposes of this opinion the case made by their amended petition is sufficiently shown by the statement in the brief of the appellant Trust Company, which is as follows:

"These heirs allege that their father was possessed of a community estate, one-half of which they inherited through their mother after her death, but it is not alleged when she died. The petition is sworn to by Dozier, the husband of one of the heirs, and the witness whose testimony was rejected, as per bill of exceptions of said heirs and the railroad company, which was considered under the assignment of errors made by the railroad company and Bremond's administrator, and alleges that the corporation was never organized under the act of incorporation, and that their father falsely and fraudulently assumed to have organized a company in pursuance of said act and proceeded to survey and build the railroad so chartered. They aver and swear that all writings purporting to be minutes or accounts of said organization were false, forged, and mythical; that no certificate of stock was ever issued to any one, although in their original petition for a receiver they claimed as heirs of their father, who they alleged owned all the stock. They also allege that there never was any meeting of the stockholders, but that their father conceived the purpose, and intending to defraud them of their property and estate converted the same to the building of said railway, falsely and fraudulently pretending that the same was being built, managed, and controlled by a company under an act of incorporation; that their father kept them in ignorance of what he was doing, and they believed from his representations that he was managing and controlling the estate belonging to them to the best advantage and for their interest, but that he concealed from them his actings, doings, and transactions, and kept them in total ignorance of the same; that their father invested more than $500,000 in said railway. They sue for partition, alleging that said community fund built one hundred and twenty miles of said road, and ask that the same be set off to them in partition,

and if not susceptible of partition, that it be sold and the proceeds given them.''

The cross-assignment of error is that ''the court erred in sustaining the exceptions of M. G. Howe, receiver, to their amended original petition.'' We find an exception to the pleading purporting to be by ''the Houston East & West Texas Railway Company by M. G. Howe, receiver.'' The order complained of reads as follows: ''Demurrer and motion to strike out all the pleadings of the heirs of Mary Bremond as made by the plaintiff the Houston East & West Texas Railway Company sustained and motion granted. Ruling excepted to by said heirs without prejudice to their rights in some appropriate proceeding.'' This clearly means that their amended petition was dismissed without prejudice. We think the court did not err in its ruling. The pleading states expressly that it is filed ''in substitution and lieu of their original petition,'' and it had the effect of an abandonment by these parties of their original cause of action. Their original petition claimed as heirs and legatees of their father, and the amended petition claimed adversely to their father and wholly as heirs of their mother. It alleged a new and distinct cause of action and was properly treated as an original plea in intervention filed upon the eve of the trial. It sought to introduce into a suit already complicated new issues, and was well calculated to protract the litigation. Under such circumstances the court had at least the discretion upon motion of any party to strike out the petition, and there would have to be a very clear case of an abuse of that discretion for this court to hold that the ruling was error. The dismissal of the petition was without prejudice, and their rights remain wholly unaffected by the result of this suit.

We will next consider assignments of error presented by the Union Trust Company. That appellant first complains that the court erred in holding that its second mortgage does not embrace certain lands and town lots upon which a foreclosure was sought. The first mortgage was executed on the 1st day of May, 1878. On the 1st day of January, 1883, a second mortgage was executed. It conveyed all the property embraced in the first and in addition thereto the income of the road, and also certain lands by the following description: ''Seventy-five thousand acres of land or more owned by said railway company and lying contiguous to said trunk line and its authorized branches, the larger portion whereof being heavily timbered (which said lands are embraced in schedules thereof marked 'Exhibit A' and hereunto annexed as a part hereof), and such other lands as may be acquired by said railway company in east and northeast Texas in the section of country bordering on and adjacent to its trunk line and authorized branches, as will be shown by the records of the respective counties in which said lands may lie, save and except the blocks and lots designated and laid off in the town sites acquired and hereafter to be acquired.'' Attached to

that mortgage is a schedule description of the lands conveyed. Doubts having arisen as to the validity or construction of the instrument, on December 4, 1884, the stockholders of the corporation in meeting authorized the execution of another mortgage to secure the same bonds. The resolution shows by its recitals that the main purpose of authorizing a new mortgage was to make a valid one to take the place of the former security on account of its doubtful validity. It authorized a mortgage of the same property except the lands; and it was probably intended that it should embrace in the main the same lands, though that purpose is not directly expressed. The description of the lands in the resolution is as follows:

"Seventy-five thousand acres of land or more owned by said railway company and lying contiguous to said trunk line and its authorized branches, the larger portion whereof being heavily timbered, and also such as may be acquired by said company in any county through or into which said trunk line or any of its branches are now or may hereafter be constructed; and any and all land which said company may hereafter acquire in east and northeast Texas in the section of country bordering on or adjacent to its trunk line and authorized branches; and also the blocks and lots laid off and designed in the town sites of said railway, and also the town lots situated in the city of Houston, Harris County, Texas, schedules of which lands and town lots and blocks are attached to the mortgage hereinafter set forth."

No schedule accompanies the resolution.

In the mortgage in question the same language is used as descriptive of the land conveyed, and "Schedule A" and "Schedule B" are referred to for a more particular description of the lands and town lots respectively. It was shown, however, that at the time of its execution and delivery no schedules were attached. After this suit was instituted schedules were annexed to and recorded with the mortgage, but counsel for appellant attach no importance to that action, nor do they claim that the description in the mortgage is sufficient of itself. If the language had clearly shown that all the lands and town lots owned by the corporation in the localities named were intended to be included, they could be identified by proof of the lands so owned, and the reference to the schedules should be treated as mere false description which is harmless. But there are no words used indicating that all the lands or town lots of the company were to be embraced; on the contrary the inference is that only such as should be named in schedules attached were to be included.

We understand the specific contention of the appellant Trust Company to be that because the mortgage of 1884 was intended merely to cure the defects in that of 1883, therefore the description in the later instrument should be aided by that in the former. It is evident, we think, that the leading purpose of the mortgage of December, 1884, ·

was to make valid and effectual what was attempted to be done by that of January, 1883; but it is by no means clear that they were intended to cover precisely the same property. If such had been the intention it would have been appropriate and easy to have expressed such intention, both in the resolutions authorizing the later mortgage and in the mortgage itself. But there is no such expression either in the resolutions or the mortgage. We think it evident that the intention in drawing the mortgage was that it should contain a complete and independent description of the property conveyed without reference to the former instrument, for which it was intended in the main as a substitute. It is probable that there had been some changes in the lands owned by the company—some may have been disposed of and others acquired; that they were not intended to cover precisely the same lands, and that on this account no reference was made in the later to the previous instrument for description. Whether such reference was purposely avoided or not, it is apparent that none exists. We think, therefore, the description in the one mortgage can not be aided by that in the other. It results that in our opinion the court did not err in holding that the lands and town lots in question were not embraced by the second mortgage.

By its other assignments the Trust Company complains of the action of the court in allowing priority to certain creditors of the insolvent corporation over the bonds secured by the first and second mortgages. The debts of these creditors were ranked, as before stated, in three classes: 1, "Statutory claims;" 2, "Operating expenses;" and 3, "Construction claims." For convenience in determining the questions involved we will first consider the construction claims. These were certain debts incurred by the receiver in constructing new road under orders of the court. There is no objection urged to giving these claims priority. It is, however, insisted that the court erred in allowing priority to certain debts incurred by the company in constructing new road before the receiver was appointed.

Though the doctrine is of recent origin, it has become settled law in this country that in the final distribution of the assets of an insolvent railroad corporation which has been placed in the hands of a receiver there are certain claims against the fund which, under certain circumstances, are entitled to priority of payment over the debts of the corporation secured by mortgage upon its property. Railway v. Cowdrey, 11 Wall., 459; Fosdick v. Schall, 99 U. S., 235; Hale v. Frost, 99 U. S., 389; Miltenberg v. Railway, 106 U. S., 286. The expenses of operating the railway while in the hands of the receiver have been uniformly allowed, and it would seem that as to claims of this class there should never have been any serious difficulty. Being the expenses of administering the trust fund, they should be a first charge upon its funds and should be awarded priority of payment. The cases cited also show that debts incurred by the company in operating its road,

including necessary repairs and "useful improvements," within a limited time before the appointment of a receiver have, at least as to the current earnings, been allowed a preference in payment over the bonded debts secured by mortgage upon its property; and when the earnings have been diverted to the payment of interest upon the bonds and in making betterments upon the property, the holders of these claims have been reimbursed from the proceeds of the sale of the railway.

The reasons assigned for this doctrine are not the same in each of the cases. In Fosdick v. Schall, *supra*, the proposition was laid down that "when a court of chancery is asked by railway mortgagees to appoint a receiver of railway property pending proceedings for foreclosure, the court in the exercise of a sound judicial discretion may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income during the receivership of outstanding debts for labor, supplies, equipment, or permanent improvement as may under the circumstances of the particular case appear reasonable," and "that if no such order is made when the receiver is appointed, and it appears in the progress of the cause that bonded interest has been paid, additional equipments provided, or lasting and valuable improvements made out of earnings which ought in equity to have been employed to keep down debts for labor, supplies and the like, it is within the power of the court to use the income of the receivership to discharge obligations which but for the diversion of funds would have been paid in the ordinary course of business." The opinion in this case was by Chief Justice Waite and was concurred in by the whole court. In Hale v. Frost, *supra*, the Supreme Court upon a certificate that the judges below were opposed in opinion, expressly affirmed the proposition "that the net earnings of the road while in possession of the court and operated by the receiver are not necessarily and exclusively the property of the mortgagees, but are subject to the disposal of the chancellor in the payment of claims which have superior equities, if such be found to exist." And in Burnham v. Bowen, 111 U. S., 777, the court says: "Every railway mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim on the income. * * * Such being the case, when the Court of Chancery in enforcing the right of mortgage creditors takes possession of a mortgaged railway, and thus deprives the company of the right to receive any further earnings, it ought to do what the company would have been bound to do if it had remained in possession—that is to say, pay out from what it receives of the earnings all debts which in equity and good conscience, considering the character of the business, are chargeable upon such earnings. In other words, what may properly be termed debts of the income shall be paid from the income before it is applied in any way

to the use of the mortgagees. The business of a railway should be treated by a court of equity under such circumstances as a 'going concern' not to be embarrassed by any unnecessary interference with the relations of those who are engaged in or affected by it." Such are the various principles announced in support of the modern doctrine that in the settlement and distribution of the assets of an insolvent railway company which has been placed in the hands of a receiver priority of payment should be allowed to certain claims over the mortgage debts. The principle of implied consent laid down in Fosdick v. Schall, *supra*, seems to have been disregarded in the case of the Union Trust Co. v. Illinois, etc., Co., 117 U. S., 434, in which the receiver was not appointed at the instance either of bondholders or of their trustees, but the doctrine is still maintained that creditors who have labored, furnished supplies, made repairs or useful improvements in the operation, maintenance, and betterment of the railway, and who have been suddenly deprived of their remedies at law by the appointment of a receiver, are entitled to the equitable consideration of the court in the distribution of the assets of the company, and to priority in payment from the net income of the property while in the hands of the court.

As to what is commonly known as operating expenses there is no difficulty, and so much is conceded in this case. The claims we now have under consideration are for construction of new road before the receiver was appointed and for material furnished for such construction. They accrued within six months before the appointment. It has been held that claims for construction, unless the work was done or the material furnished in pursuance of an order of the court, can not be allowed priority. We may concede that as a general rule this is correct. But we think there may be construction claims which appeal as strongly to the conscience of a court of equity as the debts which are commonly known as operating expenses, and we further think we have such claims in those now under consideration.

At the time the first mortgage was executed the railway was but an inchoate enterprise. The face of that mortgage shows that but a few miles had been completed, and that it was contemplated between the company and the mortgagees that the construction was to continue and that the bonds secured by the mortgage should issue as the road progressed. The second mortgage also shows upon its face that the construction of the road was to continue. The mortgages covered not only the road which was completed at the time they were executed, but also that which was to be subsequently constructed. While the construction was still progressing the receiver was appointed and the holders of the claims deprived of their ordinary remedies for the collection of their debts. From the operation of the road the receiver made net earnings amounting to $270,721.41, a sum more than sufficient to pay these claims and all others to which priority was allowed. This money was expended

under the orders of the court in paying interest on the bonds and in making valuable and permanent improvement upon the property subject to the mortgages.

The question here is as to the right of priority of payment out of the net earnings of the road while under control of the court. The opinion in Fosdick v. Schall, *supra,* recognizes that debts incurred for "useful improvements" have as to the net income a preference over the mortgage debts. We understand the term "useful improvements" to include not only necessary repairs but also such changes in and additions to structures already completed as may be deemed advantageous to the road in a financial point of view, and such as prudent management would demand. Such we would think would be debts created in substituting an iron and stone bridge for one made of wood. Such would be the expense of a change from a narrow gauge to a standard gauge when the exigencies of the traffic or other circumstances are such as to demand that change in order to prevent the utter failure of the enterprise and to keep up the railway as "a going concern." Ordinarily when mortgages are issued upon completed roads it is not contemplated that its income is to be applied to the construction of new road. In such cases debts incurred for such new construction ought to have no claim against the bondholders, either as to the corpus or the income of the property. (But when mortgages are executed upon an unfinished road and they show upon their face that it was contemplated that the work of construction should be prosecuted to completion, and when the mortgages attach to the new road as fast as it is finished, we are of opinion that the new road should be considered a "useful improvement," and that if the road be put in the hands of a receiver before the work and materials are paid for, holders of the claims for such work and material should be paid from the net income of the road while under control of the court, if there be any.) The claims now under consideration accrued within six months before the appointment of a receiver, and the holders, being guilty of no laches, were prevented by the action of the court from subjecting the property to the payment of their debts through the courts of law. We think therefore it was the duty of the court to protect them in its final decree if there was on hand a fund which could be applied to the payment of their debts.

The net earnings of the road were not on hand at the time of the trial, but had been expended by order of the court in paying interest on the bonded debt and in improvements upon the property subject to the mortgage, which enhanced its value to the full amount so expended upon it. In reference to the earnings of the road, counsel for this appellant expressly concede "that the mortgagees' rights thereto as against common creditors did not attach until the trustee or the mortgagees took possession in person or by agent, or by a receiver appointed at *their instance.*" Their concession is the result of a well es-

tablished line of decisions in the highest court of the country. Railway v. Cowdrey, 11 Wall., 459; Gilman v. Tel. Co., 91 U. S., 603; Bridge Co. v. Heidelbach, 94 U. S., 798; Fosdick v. Schall, *supra*. They insist, however, that since they were not parties to the suit when the court ordered the funds to be applied to the several purposes mentioned, and since they can not be considered as having consented to such application, the appropriation to the payment of interest and of improvements upon the road is not to be considered such a diversion as "would require them to be reimbursed either by the mortgagees or out of the corpus of the property." We do not understand that the right of creditors having an equitable claim upon the net earnings of an insolvent railway to be reimbursed, when these earnings have been diverted to another purpose, depends upon the consent of any party. The principle is not that the mortgage creditors are responsible for the diversion, but that the diversion was in derogation of the rights of those entitled to the fund, and that therefore the money should be restored. The bondholders have received the entire benefit of the diversion in this case, either directly in money or indirectly in the enhancement of the value of the property subject to their mortgages, and if they have no superior right to the net earnings it follows that they have no right to complain of the action of the court in restoring that fund from the proceeds of the sale of the mortgaged property.

We have found no case in which preference to claims for work done and material used in construction of new road have been given a preference over the debts secured by mortgage. On the other hand there are several cases in which such preference has been denied; but we think each of these cases differs in some important particular from this. In Hale v. Frost, 99 United States, 384, a claim for construction material was denied priority. The report of the case is meager, but it would seem from a remark in the opinion in Williamson v. Railway, 33 Grattan, 631, "that this material was used in the construction of an independent branch road." In Porter v. The Bessemer Steel Co., 120 United States, 649, and Hand v. Railway, 17 South Carolina, 219, the effect was to charge the construction claims upon the railway itself in preference to the mortgage debts. It does not appear that in either case there was any net income from the operation of the road while in the hands of the court. From the report of the case of Addison v. Lewis, 75 Virginia, 701, it does not appear that there was any net income to the credit of the cause or that it had been diverted. The petition of intervenors simply showed that their claim was due them as contractors in building an extension of the railway without an averment, so far as the opinion shows, of any other circumstance entitling them to equitable consideration.

It follows that we are of opinion that the court did not err in awarding priority to the construction claims.

The appellant Trust Company also insists that the court erred in giving priority to the class of claims designated as claims having "statutory liens." The court found that the holders of these claims were secured by a lien upon the railway and its equipments by virtue of the Act of February 18, 1879. Sayles' Civ. Stats., art. 3179a and note. The first mortgage was executed before the passage of this act, and it is urged that by reason of this fact the act is inoperative as against the bonds secured by that mortgage. The argument is that the act as applied to the holders of obligations secured by mortgages existing on the railway at the time the act took effect is in derogation of the Constitution of the State and that of the United States, and is therefore void. We doubt whether this position can be successfully maintained (Provident Institution v. Jersey City, 113 United States, 506), but we do not deem it necessary to decide the question. The special master found that all these debts were due for labor performed in the construction, operation, and maintenance of the railway within twelve months before the appointment of the receiver. The report in this respect was not contested. The claims are therefore of such a character as to entitle them to priority of payment out of the net earnings of the property in the hands of the receiver, unless priority should be denied them by reason of the fact that they did not accrue within the six months next preceding the receiver's appointment.

When a court appoints a receiver of the property of a railway company and makes an order directing him to pay claims of its operatives for services rendered prior to the appointment, it would seem proper to prescribe a period of time within which the debts to be so paid should have accrued. But we think such an order should be only provisional, and that it could not properly be held conclusive against any one not a party to the suit at the time the order was made. In this case the court in accordance with the more general practice fixed that limit as to time at six months before the receiver's appointment. Such a limit is purely arbitrary, but as long as it is simply provisional it is proper. The court seems to have been of opinion that the time fixed in the order of appointment should govern throughout the case. The rule laid down by the court is that the holders of claims for operating expenses have a right to the current revenue superior to that of the mortgage creditors, and that it continues until it is lost by such delay in the prosecution of their claims as should be sufficient to bar their equity. The period of time necessary for this purpose depends upon the circumstances of each particular case. That the period and the right are not dependent upon the implied consent of the bondholders to the order of the court which appoints the receiver and directs the payment of claims of certain classes which have accrued within a fixed period of time prior to the order, is shown by the case of the Union Trust Company v. Illinois, etc., Company, 117 United States, 374, in

which the mortgagees were not parties to the suit at the time the receiver was appointed and the order was made.

The limitation of not longer than six months has been the rule in the trial courts, but in the Supreme Court of the United States claims have been allowed which accrued for a much longer period before the receiver's appointment. In Hale v. Frost, *supra,* the claim of Hale, Ayer & Company, which was allowed priority, was for supplies to the machinery department furnished nearly two years before the receiver took possession.

In Burnham v. Bowen, *supra,* it did not appear that the debt accrued within six months before the appointment. In the following cases also that limit appears to have been disregarded: Douglass v. Cline, 12 Bush., 608; Williamson v. Railroad Co., 33 Gratt., 624; Skiddy v. Railroad Co., 3 Hughes, 320; Atkins v. Railroad Co., Id., 307. In Blair v. Railroad Co., 17 American and English Railway Cases, 337, the court recognized liens accruing under the statutes of Missouri and gave to similar claims from other States, when there was no statute allowing such liens, an equal dignity. If it was meant to place them upon the same footing merely as to the time of their accrual the principle would seem sound. Equity follows the law, and if there be no law directly applicable it will follow the analogy of the law. The creditors whose claims are now under consideration had a lien given by law upon the railroad and its equipments. Let it be conceded that it was subsidiary to the mortgages. They nevertheless had a lien against the railway company and a right to enforce it against the equity of redemption in the property. The twelve months during which that right continued to exist had not elapsed when the court took control of the assets of the company. We are of opinion that they should not be held guilty of laches in prosecuting their claims until their liens were lost by delay, and that the mere lapse of more than six months between the time in which the claim accrued and the appointment of a receiver does not afford a sufficient reason for denying a priority to which they would otherwise be entitled.

To some of these claims there are more specific objections. It is urged that the claims embraced in "Exhibit B" of the master's report were not for labor furnished upon the railway. The report of the master is that "'Exhibit B' is a list of claims for board alleged to have been furnished either by intervenors or by others, and the claims therefor assigned to intervenors, to mechanics, laborers, and operatives employed by said railway company in the construction, maintenance, and operation of its railway or its equipments." It appears that it was the understanding between the company, the laborers, and the boarding house keepers that the company should retain a sufficient amount of the wages of the laborers to pay their board, and that the wages so retained should be paid to the keepers of the boarding house in dis-

charge of the board.  In contemplation of law the transaction is the same as if the laborers, after the wages were due, had in settlement of their board given orders upon the company for an amount sufficient to pay it and the company had accepted them.  In equity at least it is a valid assignment of the debts due for wages.

So also there was an arrangement between the company, the laborers, boarding house keepers, and the grocers who furnished supplies to the latter, to the effect that of the money retained from the wages of the laborers for the benefit of the boarding house keepers the company should hold and pay to the grocers an amount sufficient to discharge their claims for the supplies so furnished.  In pursuance of these agreements the company credited the boarding house keepers with the wages of the laborers retained, and also credited the grocers with the amounts of their bills.  The claims so accruing in the hands of the boarding house keepers and in the hands of the grocers were properly treated as claims originally due laborers, etc., and duly assigned to the holders. That a right to priority attaching to a claim of this character is not destroyed by assignment is settled by the cases of Burnham v. Bowen, 111 United States, 777, and Union Trust Company v. Walker, 107 United States, 596.  This court has held that when a vendor sells land upon a credit and the vendee executes a note for the purchase money payable to a third party, the payee has a lien upon the land for its payment. Pinchain v. Collard, 13 Texas, 333.  If the lien of the vendor passes to the payee in that case, we see no reason why the principle should not apply to these claims.  In some instances where a number of these debts due for wages had become the property of one person the company gave the assignee a promissory note for the aggregate amount.  This merely changed the evidence of the indebtedness and did not change the character of the debts.

Appellee Jacob Binz was the holder of many of these claims, for some of which he took the notes of the company indorsed by Paul Bremond. It is insisted that this was a waiver of his lien, if any he had.  The claim for priority is held not to be a lien, and hence the law of liens is not applicable.  But the special master found in relation to these claims as a matter of fact that in taking the indorsement there was no intention to waive a lien against the company.  In this State we hold, as to vendor's liens at least, that the taking of an independent security of any character is *prima facie* a waiver of lien, but that in every case it is a matter of intention to be determined by the evidence.

It is also assigned that the court erred in giving priority to the claim of the Dixon Manufacturing Company.  It is not objected that their claims were not for operating expenses and as originally incurred would not have been payable under the court's order made when it appointed the receiver.  The objection is that the claim consisted in part of two promissory notes made by the company and indorsed by Bremond.

The special master found that there was no intention to waive any lien in taking Bremond's indorsement. What we have previously said is sufficient to dispose of this question.

The appellant the Union Trust Company also complains that the court erred in adjudging that a claim of appellee Binz, consisting of three promissory notes which purported to be secured by a pledge of three-fourths of the gross earnings of the railway, were, "entitled to priority *pari passu* with the claims for operating expenses." These notes were given for money borrowed to pay interest on the bonds and each contained a stipulation as follows: "Three-quarters of the gross earnings of the road from date is pledged in liquidation of this note." We are unable to see how a mere stipulation of this character can have any legal effect. If the company had placed the road in the hands of the payee or of some third person to be operated until from three-fourths of the gross income the notes would have been paid, the contract, except as to the rights of third parties, would have been valid. So also perhaps if it had been made the duty of some one who had accepted the trust to receive and apply the income. In Jones on Liens it is said that "the rule that an equitable assignment can be effected only by a surrender of control over the funds or property assigned is one that is strictly held to. A mere promise that the goods shall be held in trust for the benefit of another and that the proceeds shall be paid to him does not amount to an equitable assignment of the goods or a specific lien upon them, for in such case the owner retains control of the goods and may appropriate them or their proceeds to the payment of other creditors, and the holder of such promise can not follow the goods any more than he can follow the proceeds. He has no lien either upon the goods or their proceeds. The owner violated his promise, and for this he is personally responsible." The text is supported by the case cited, Gibson v. Stone, 43 Barb., 285. A mortgage upon a stock of goods with a right expressly or impliedly reserved to the mortgagor to remain in possession and to continue to sell them in ordinary course of trade is void—if for no other reason, because the reservation of the right to sell is inconsistent with the idea of a lien. Moreover, if a mortgagee's right to the net earnings of a railway is not effected until he takes possession either by himself or through a receiver in pursuance of the terms of the mortgage, as was held in Gillman v. Telegraph Company, *supra*, we do not see how the appellee Binz has acquired any claim upon the gross earnings in this case. We think the court erred in giving these claims priority over the bonded debt.

This disposes of all assignments of error presented by brief except that of appellees Milby & Dow. They intervened for the establishment of two claims against the railway company, which were for coal furnished for the purpose of operating its road. One accrued in December, 1884, and the other in January, 1885—the one a little more

and the other a little less than six months prior to the appointment of the receiver. Priority in payment was allowed to the junior claim, but was denied to the older. We see no sufficient reason for the distinction and it seems to us arbitrary. There was no circumstance disclosed by the report of the master or the evidence upon the trial to show laches as to the one claim more than as to the other. In the case of Burnham v. Bowen, *supra*, priority was allowed to a claim for the price of coal furnished to the railway company, although it did not appear that the claim accrued within six months before the receiver's appointment. It is evident from the opinion that the period of six months was treated as a matter of no importance. We think the court should have held both the claims of these appellees as entitled to payment prior to the mortgage bonds.

So much of the decree of the lower court as awards priority of payment over the mortgage debt to the claim of appellee Binz, consisting of three promissary notes and amounting at the date of the decree to the sum of $2390.25, principal and interest, and so much of the decree as refuses such priority to the claim of appellees Milby & Dow for $541.65, is reversed, and a decree will be here rendered directing that the said claim of appellee Binz be classed and paid pro rata with the general creditors, and that the claim of Milby & Dow be classed and paid prior to the mortgage bonds. In all other respects the judgment is affirmed.

The Houston East & West Texas Railway Company will pay all costs of the appeal. The heirs of Mary Bremond and S. K. McIlhenny, administrator of Paul Bremond, will pay all costs incurred by reason of their cross-appeal. The Union Trust Company will recover of appellee Binz one-fiftieth of the costs of its appeal and will be adjudged to pay all other costs by it incurred.

                                        *Reversed in part and rendered.*

Delivered March 29, 1890.


[NOTE.—The record in this case reached the Reporter June, 1891.]