## TEXAS CO. v. CONTINENTAL SUPPLY CO.
### (No. 1059—5271.)

Commission of Appeals of Texas, Section B.
June 28, 1929.

T. J. Lawhon, Baker, Botts, Parker & Garwood, Morris, Sewell & Morris, and W. J. Knight, all of Houston, and Black & Graves, of Austin, for plaintiff in error.

Edward H. Bailey, of Houston, for defendant in error.

LEDDY, J. We adopt the following statement of the case made by the Court of Civil Appeals:

"The parties to this litigation were the Continental Supply Company, the Texas Company, the Oxford Oil Company, the Southern Exploration Company, R. E. Brooks, and R. E. Brooks, Jr. For convenience the four corporations will be referred to as the Continental, Texas, Oxford and Southern Companies, respectively. The litigation involves the right of the Continental Company to $19,-647.91, the agreed value of one-fourth of the production less the royalty from an oil lease covering 11¾ acres, which we will call the Autrey lease. The suit was by the Continental Company against the Texas Company. The latter impleaded the remaining parties, seeking judgment over against them. In a trial to the court. without a jury the relief sought by the Continental Company against the Texas Company and by the latter against the other parties was denied. The Continental Company alone has appealed, and the judgment in favor of the remaining parties against the Texas Company is not involved.

"The controlling facts in the case are without dispute, and may be briefly summarized as follows (quotations are from the trial court's findings): The Oxford Company was the owner of the Autrey lease, which contained stipulations requiring the drilling of offset wells.

"'After the execution and delivery of the above mentioned lease to the Oxford Oil Com-

pany, it began the drilling on the land covered in said lease of well No. 1, but such well was not completed by the Oxford Oil Company for the reason that it became financially unable to procure the necessary supplies, etc., for its completion.

"'That large oil companies, such as the Humble Oil & Refining Company and the Gulf Production Company, owned leases on tracts of land adjoining the 11¾ acres above mentioned, and such larger companies were proceeding to drill and develop leases owned by them, drilling wells in close proximity to the line of the 11¾ acre tract; and I find that the Oxford Oil Company was a small company, not sufficiently strong to cope with the larger companies.

"'That prior to the time the Oxford Oil Company began the drilling of well No. 1 on said lease, it was indebted to the plaintiff, Continental Supply Company to the extent of $21,361.12, which amount of indebtedness was still due and owing the Continental Supply Company during the time such company was drilling well No. 1, and that in the drilling of such well it became necessary for the Oxford Oil Company to procure other supplies and material to proceed with said well; that the Continental Supply Company declined to extend to the Oxford Oil Company any further credit until it would give it some security for the debt already existing and to cover such future advances.'

"For the purpose of affording the Continental Company such security the Oxford Company, on February 8, 1926, executed an instrument in the form of a general warranty deed, by which it conveyed to the Continental company 'twenty-five (25%) per cent of the production of oil to be produced by said Oxford Oil Company under and by virtue of' the Autrey lease. Thereafter the Continental Company made advances to the extent of $23,-000.00 of supplies used in development of the Autrey lease. After the execution of the instrument from Oxford Company to Continental Company the former 'recognized that it was not financially able to properly develop said lease and to cope with the larger companies which owned leases adjoining such 11¾ acre lease, and for the purpose of securing the Southern Exploration Company, one of the cross-defendants herein, to properly develop said lease and drill the necessary wells thereon in order to protect the same from drainage,' the Oxford Company on February 19, 1926, conveyed to the Southern Company an undivided one-half interest in the Autrey lease. Contemporaneously there was executed by the Oxford and Southern Companies as first and second parties, respectively, a development or operation agreement covering the Autrey lease and two other leases owned by the Oxford Company, a half interest in which had also been assigned to the Southern

Company. This operation agreement provided, among other things, the following:

" 'Second party further agrees and obligates itself at its own cost and expense to complete the oil well it is now drilling on the R. L. Autrey lease, and to properly case said well and complete it fully in every detail except that flow lines and storage tanks shall not be included. Second party represents that it is the legal owner of said lease (referring to the Autrey 11¾ acre lease above mentioned) and the said well, and all interests therein, and that same is free and clear of incumbrance, except a one-fourth (¼) interest in the production from said well is pledged to the Continental Supply Company to secure the amount due said company by second party for supplies for said well.' "

" 'In said contract it was provided that the Mullins, Autrey and Rogers leases should be designated and referred to as joint properties, and that the drilling of wells and sinking of mines, or the producing, saving, storing, transporting and selling of any products from said leases should be described as joint operations, and that such joint operations should be under the control and management, and in the judgment of the first party, who should have the right to make such expenditures and incur said indebtedness for such purposes as in its judgment might appear reasonable and proper; and it was further provided therein that all costs and expenses incurred in the joint operations above defined, together with all expenses reasonably growing out of or reasonably incident thereto should be charged to the joint account of the parties in equal proportions, and that the production from such joint operations should belong equally to the first and second parties.

" 'And it was further provided therein that should the second party default in the payment of any sums which might be due under said contract, that the other party should have the right to apply towards the liquidation thereof the interest of such defaulting party, in the oil, gas or other minerals on hand, or which might thereafter be produced.'

" 'That on January 8th, 1926, the date of the instrument above copied from the Oxford Oil Company to the Continental Supply Company, and from February 19, 1926, the date of the transfer of the one-half interest in said lease to the Southern Exploration Company, the 11¾ acre lease was considered by the Continental Supply Company, the Oxford Oil Company and the Southern Exploration Company, as well as the oil fraternity in general, as a very valuable lease, and at that time and for some months thereafter it was thought that said lease would be an enormous producer of oil; that it was anticipated at said times by the Continental Supply Company that the Oxford Oil Company would be able to pay to it the entire indebtedness due it by the Oxford Oil Company from the proceeds of the sale of one-fourth of the oil so pledged to it, after charging said one-fourth interest with its just share and proportion of the cost of the expense of exploiting said lease and producing oil therefrom; and it was anticipated by the Southern Exploration Company and the Oxford Oil Company that substantial profits would accrue to each of said companies from the production of oil from said lease.'

"Under this development contract the Southern Company expended in drilling and development on the Autrey lease the sum of $172,290.46, which the parties agreed was reasonable and necessary; and the total production from that lease which was purchased by the Texas Company amounted to $78,571.66, after paying Autrey's royalty. Under a division order agreement, to which the Continental Company was not a party, the Texas Company paid the royalties to Autrey and paid the balance to the Southern Company, being indemnified against other claimants by the Brookses. The Southern and the Texas Companies had both actual and record notice of the assignment from Oxford Company to the Continental Company."

The Court of Civil Appeals held, in a very clear and well-reasoned opinion, that the Southern Exploration Company, having purchased a one-half interest in the Autrey lease from the Oxford Company and entered into a joint operating agreement with that company for the development thereof, with both actual and constructive notice of the right of the Continental Supply Company under its mortgage, its claim for reimbursement for expenses incurred in developing such lease was inferior to the right claimed by the Continental Supply Company under its mortgage. We fully concur in the views expressed in the opinion of the Court of Civil Appeals. The principal questions involved in the appeal are fully treated in that opinion; hence we will confine ourselves to a discussion of one aspect of the case which has been very ably presented in this court, but which was not discussed by the Court of Civil Appeals.

Plaintiff in error insists that, if the drilling operations on the Autrey lease had not been conducted, the rights of the Continental Supply Company under its mortgage would have been destroyed or the value of its security would have been lessened by drainage through wells drilled on adjoining leases, and that, it having advanced the money necessary to carry on drilling operations to preserve the lease, with the knowledge and implied consent of the Continental Supply Company, equity should charge against the oil produced the reasonable cost of producing it.

It may be admitted that there might be circumstances under which equity will decree a superior lien in favor of a third party or stranger who advances money to protect and preserve the mortgage security when the

mortgagor is unable to do so. Houston National Exchange Bank v. De Blanc (Tex. Civ. App.) 247 S. W. 897; McIlhenny, Administrator, v. Binz, 80 Tex. 1, 13 S. W. 655, 26 Am. St. Rep. 705; Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339; Jones on Chattel Mortgages, p. 574. The facts surrounding the transaction involved in this case, in our opinion do not bring it within the rule announced by the above authorities.

It is repeatedly stated by plaintiff in error in its argument that the Oxford Oil Company was insolvent. The record does not bear out this statement. It is only made to appear that the Oxford Oil Company did not have sufficient cash on hand to properly develop the lease. But, at the time the transaction involved incurred, this company was the owner of what was considered to be a very valuable oil lease. Being the owner of such a lease, it was in position to make a contract for its development, which it seems it had little difficulty in doing. That all parties considered this lease as being very valuable appears from the testimony of R. E. Brooks, Jr., president of the Southern Exploration Company. With reference to the value of the lease, he testified:

"When we took this lease over I would say it was considered very valuable; considered so, I say, because development had proven that the Rogers well that the Oxford Oil Company had drilled had hit the salt which opened up this territory that had previously been condemned.

"I regarded this Autrey lease as the best in that field. I was later told by Mr. Pratt of the Humble Company that he considered it one of the best. In fact, Mr. Bass, had said we might make a million dollars out of it—I remember that 'million.' He thought well of it, I am quite sure."

It seems that all of the parties connected with the development of this lease thought it would produce sufficient oil to pay all costs of development and leave a very large profit for the companies developing it. Under such circumstances, it is idle to say that the Oxford Oil Company was unable to protect and preserve the mortgaged property.

■ The trial court and the Court of Civil Appeals found, and such finding cannot be successfully challenged in this court, that, at the time of the assignment of the one-fourth of the oil produced from the Autrey lease was made by the Oxford Oil Company to the Continental Supply Company, it was intended by all the parties to secure the indebtedness due by the Oxford Oil Company, and was therefore a mortgage.

It appears that the Oxford Oil Company conveyed a one-half interest in the Autrey lease and a similar interest in another lease owned by it, known as the Rogers lease, to the Southern Exploration Company, and that company conveyed to the Oxford Oil Company a one-half interest in what was known as the Mullins lease, consisting of 83 acres. Contemporaneously with these conveyances, and as a part of the same transaction, these companies entered into an operating agreement by the terms of which they were to jointly bear the costs of development of these leases; the Southern Exploration Company doing the active drilling work and charging against the Oxford Company one-half the costs incurred. Each party was to receive, after the payment of such costs, one-half of the oil produced from these three leases.

■■ The Oxford Oil Company rested under the obligation of drilling for the oil to be produced from said lease, and it could not avoid performance of such obligation by conveying a portion of the property and entering into a joint operating agreement for the development thereof with another company. The Southern Exploration Company, having voluntarily entered into such relation, can occupy no better ground than that held by the Oxford Oil Company, whose right to the oil produced from said lease was unquestionably subordinate to the mortgage of the Continental Supply Company.

■ While the Oxford Oil Company did not have the immediate funds on hand with which to develop the Autrey lease, yet such fact did not render it incapable of protecting its lease from forfeiture, as the lease was of such value it was able to enter into the joint operating agreement by means of which it could successfully protect and preserve the lease by fulfilling the drilling obligations required thereunder. The Southern Exploration Company does not occupy the position of a third party or a stranger who merely advances money to protect mortgaged property, which the mortgagor is unable to protect, but rather is in the attitude of one who enters into a contract for the development of an oil lease, which promises very large returns for the money expended. When the returns from its venture are disappointing and reveal a loss, it will not be permitted to recoup such losses at the expense of a mortgagee, of whose rights it had full notice at the time it entered into such development contract.

There is another fatal objection to the application of the equitable doctrine attempted to be invoked by plaintiff in error, and that is that the joint operating agreement by the Oxford Oil Company and the Southern Exploration Company was not merely limited to a development of the Autrey lease against which the Continental Supply Company held its mortgage. As a part of the consideration for which the Autrey lease was to be developed, the Southern Exploration Company acquired a one-half interest in the Rogers lease, and the Oxford Oil Company acquired a one-half interest in the Mullins lease. The Mullins lease was shown to have a large potential value at that time. The value of this lease is shown by the statement of the presi-

dent of the Oxford Oil Company in a letter written to the Continental Supply Company under date of May 7, 1926, in which the following statement is made:

"In addition to the valuable Autrey lease we own 83 acres out of the Mullins lease, the value of which can best be shown by the recent sale of 20 acres by Mullins to the Gulf Production Company for $66,000.00 cash. However, it is well known that this 20 acres which the Gulf Company bought does not lie as well as our 83 acres."

According to this statement, the Mullins lease, the transfer of which to the Oxford Company formed a part of the consideration for the development of the Autrey lease, was well worth several hundred thousand dollars at the time of the transfer. The record is devoid of any evidence showing the financial result of the development of the Mullins and Rogers leases, which, together with the Autrey lease, constituted the basis for the joint development agreement between the Oxford Oil Company and the Southern Exploration Company. For aught that appears from this record, these companies may have produced sufficient oil from the first two leases to have reimbursed themselves for all expenses incurred in connection with all of the leases, and in addition thereto made a very substantial profit. The amount that these companies expended in the development of the leases outside of the Autrey lease is not shown, nor is there any evidence showing what, if any, oil was produced therefrom. We cannot assume, in the absence of any proof whatever, that these leases were unprofitable or were never developed.

If, as a matter of fact, the companies operating under this joint agreement made a large profit off of the development of two of the leases over and above all of the amounts expended by them in developing the three leases, they would stand in a poor position in a court of equity to claim that the cost expended by them in developing the Autrey lease should be adjudged a prior lien on the production from said lease to that of the indebtedness secured by the mortgage of the Continental Supply Company, of which they had actual notice at the time they entered into the joint operating agreement.

Much stress is laid upon the fact that the Continental Supply Company remained silent and made no objection to the development of the Autrey lease by the Southern Exploration Company. No valid reason existed why it should make any objection to such development. The Oxford Oil Company was the owner of the lease, and had the legal right to sell a one-half interest therein to the Southern Exploration Company. After doing so, it also had the right to enter into an operating agreement with the Southern Exploration Company for the development of the lease, as such operating agreement enabled it to perform the drilling obligations it was under the duty to perform to the lessor and to the mortgagee, the Continental Supply Company. Inasmuch as the sale of an interest in the lease and the operating agreement placed the Oxford Oil Company in position to preserve the mortgaged property, which it was its duty primarily to do, no right of the Continental Supply Company was jeopardized by its failure to voice an objection thereto.

We recommend an affirmance of the judgment of the Court of Civil Appeals.

CURETON, C. J. Judgment of the Court of Civil Appeals affirmed, as recommended by the Commission of Appeals.