## CONTINENTAL SUPPLY CO. v. TEXAS CO.
### (No. 7224.)

Court of Civil Appeals of Texas. Austin.
May 16, 1928.

Rehearing Denied June 13, 1928.

1. **Mines and minerals** ⬦➤74—**Conveyance by lessee of 25 per cent. of production of oil in leased premises held to assign interest in realty.**

Instrument in form of general warranty deed, by which oil company conveyed 25 per cent. of production of oil under lease of certain property, as security, involved transfer of interest in realty and not personalty.

2. **Mines and minerals** ⬦➤73—**Whether lessor retains interest in realty or personalty under oil lease depends upon whether he receives share of oil production in kind or in money.**

Test whether lessor in oil lease retains an interest in realty or personalty depends upon whether he is to receive a share of the oil production in kind or, at the lessee's option, in money.

3. **Mines and minerals** ⬦➤54½—**Lessee's conveyance of 25 per cent. of oil produced under lease, though absolute in form, held mortgage, where given as security.**

Instrument whereby lessee, under oil lease, conveyed 25 per cent. of oil to be produced under the lease, constituted mortgage and not an assignment, where given as security for loan, though absolute in form.

4. **Vendor and purchaser** ⬦➤228(7)—**Grantee of mortgagor, who has actual or constructive notice of mortgage, takes subject to mortgagee's rights.**

Grantee or assignee of mortgagor, with notice of mortgage, either actual or constructive, takes subject and subordinate to the rights of the mortgagee.

5. **Mines and minerals** ⬦➤74—**Right of assignee of lessee to one-fourth of oil production under lease held not impaired by subsequent operating agreement of another company with lessee relative to cost of production.**

Company taking from lessee assignment as security of 25 per cent. of production of oil under lease was not chargeable with reasonable cost of production under subsequent operating agreement entered into between lessee and another company, since the third company, having knowledge of the rights of the assignee, took subject to the assignment and acquired no greater rights than the lessee.

Appeal from District Court, Harris County; Ewing Boyd, Judge.

Suit by the Continental Supply Company against the Texas Company and others. From an adverse judgment, plaintiff appeals. Reversed and rendered.

Edw. H. Bailey, of Houston, for appellant.
Baker, Botts, Parker & Garwood, T. J. Lawhon, W. J. Knight, and Morris, Sewell & Morris, all of Houston, for appellee.

McCLENDON, C. J. The parties to this litigation were the Continental Supply Company, the Texas Company, the Oxford Oil Company, the Southern Exploration Company, R. E. Brooks, and R. E. Brooks, Jr. For convenience, the four corporations will be referred to as the Continental, Texas, Oxford, and Southern Companies, respectively. The litigation involves the right of the Continental Company to $19,647.91, the agreed value of one-fourth of the production less the royalty from an oil lease covering 11·¾ acres, which we will call the Autrey lease. The suit was by the Continental Company against the Texas Company. The latter impleaded the remaining parties, seeking judgment over against them. In a trial to the court without a jury, the relief sought by the Continental Company against the Texas Company and by the latter against the other parties was denied. The Continental Company alone has appealed, and the judgment in favor of the remaining parties against the Texas Company is not involved.

The controlling facts in the case are without dispute, and may be briefly summarized as follows (quotations are from the trial court's findings):

The Oxford Company was the owner of the Autrey lease, which contained stipulations requiring the drilling of offset wells.

"After the execution and delivery of the above-mentioned lease to the Oxford Oil Company, it began the drilling on the land covered in said lease of well No. 1, but such well was not completed by the Oxford Oil Company, for the reason that it became financially unable to procure the necessary supplies, etc., for its completion.

"That large oil companies, such as the Humble Oil & Refining Company and the Gulf Production Company, owned leases on tracts of land adjoining the 11¾ acres above mentioned, and such larger companies were proceeding to drill and develop leases owned by them, drilling wells in close proximity to the line of the 11¾-acre tract; and I find that the Oxford Oil Company was a small company, not sufficiently strong to cope with the larger companies.

"That, prior to the time the Oxford Oil Company began the drilling of well No. 1 on said lease, it was indebted to the plaintiff, Continental Supply Company, to the extent of $21,361.12, which amount of indebtedness was still due and owing the Continental Supply Company during the time such company was drilling well No. 1, and that in the drilling of such well it became necessary for the Oxford Oil Company to procure other supplies and material to proceed with

said well. That the Continental Supply Company declined to extend to the Oxford Oil Company any further credit until it would give it some security for the debt already existing and to cover such future advances."

For the purpose of affording the Continental Company such security, the Oxford Company, on February 8, 1926, executed an instrument in the form of a general warranty deed, by which it conveyed to the Continental Company "twenty-five (25%) per·cent. of the production of oil to be produced by said Oxford Oil Company under and by virtue of" the Autrey lease. Thereafter the Continental Company made advances to the extent of $23,000 of supplies used in development of the Autrey lease. After the execution of the instrument from Oxford Company to Continental Company, the former "recognized that it was not financially able to properly develop said lease and to cope with the larger companies which owned leases adjoining such 11¾-acre lease, and, for the purpose of securing the Southern Exploration Company one of the cross-defendants herein, to properly develop said lease and drill the necessary, wells thereon in order to protect the same from drainage," the Oxford Company, on February 19, 1926, conveyed to the Southern Company an undivided one-half interest in the Autrey lease. Contemporaneously there was executed by the Oxford and Southern Companies as first and second parties, respectively, a development or operation agreement covering the Autrey lease and two other leases owned by the Oxford Company, a half interest in which had also been assigned to the Southern Company. This operation agreement provided, among other things, the following:

" 'Second party further agrees and obligates itself at its own cost and expense to complete the oil well it is now drilling on the R. L. Autrey lease, and to properly case said well and complete it fully in every detail except that flow lines and storage tanks shall not be included. Second party represents that it is the legal owner of said lease (referring to the Autrey 11¾-acre lease above mentioned) and the said well, and all interests therein, and that same is free and clear of incumbrance, except a one-fourth (¼) interest in the production from said well is pledged to the Continental Supply Company to secure the amount due said company by second party for supplies for said well.' "

"In said contract it was provided that the Mullins, Autrey, and Rogers leases should be designated and referred to as joint properties, and that the drilling of wells and sinking of mines, or the producing, saving, storing, transporting, and selling of any products from said leases should be described as joint operations, and that such joint operations should be under the control and management, and in the judgment of the first party, who should have the right to make such expenditures and incur said indebtedness for such purposes as in its judgment might appear reasonable and proper; and it was further provided therein that all costs

and expenses incurred in the joint operations above defined, together with all· expenses reasonably growing out of ·or reasonably incident thereto should be charged to the joint account of the parties in equal proportions, and that the production from such joint operations should belong equally to the first and second parties.

"And it was further provided therein that,' should the second'party default in the payment of any sums which might be due under said contract, the other·party should have the right to apply towards the liquidation thereof the interest of such defaulting party, in the oil, gas, or other minerals on hand, or which might thereafter be produced."

"That on January 8, 1926, the date of the instrument above copied from the Oxford Oil Company to the Continental Supply Company, and from February 19, 1926, the date of the transfer of the one-half interest in said lease to the Southern Exploration Company, the 11¾-acre lease was considered by the Continental Supply Company, the Oxford Oil Company, and the Southern Exploration Company, as well as the oil fraternity in general, as a very valuable lease, and at that time and for some months thereafter, it was thought that said lease would be an enormous producer ·of oil; that it was anticipated at said times by the Continental Supply Company that the Oxford Oil Company would be able to pay to it the entire indebtedness due it by the Oxford Oil Company from the proceeds of the sale of one-fourth of the oil so pledged to it, after charging said one-fourth interest with its just share and proportion of the cost of the expense of exploiting said lease and producing oil therefrom; and it was anticipated by the Southern Exploration Company and the Oxford Oil Company that substantial profits would accrue to each of said companies from the production of oil from said lease."

Under this development contract the Southern Company expended in drilling and development on the Autrey lease the sum of $172,290.46, which the parties agreed was reasonable and necessary; and the total production from that lease which was purchased by the Texas Company amounted to $78,571.66, after paying Autrey's royalty. Under a division order agreement, to which the Continental Company was not a party, the Texas Company paid the royalties to Autrey and paid the balance to the Southern Company, being indemnified against other claimants by the Brookses. The Southern and the Texas Companies had both actual and record notice of the assignment from Oxford Company to the Continental Company.

Appellant contends that its assignment from the Oxford Company passed an indefeasible title to one-fourth of the oil when produced, that its interest therein was personalty and not realty, but that, whether the instrument be· construed as a mortgage, or as an assignment, and whether of realty or personalty, the Southern Company, by the development agreement with the Oxford Company, did not and could not acquire an interest in the production of oil from the

lease which would defeat or impair the Continental's interest, or charge that interest with a lien or equitable claim.

Appellee contends that the transfer to the Continental Company vested in the latter the title to an undivided interest in realty, thereby making it and the Oxford Company cotenants. and giving to the 'latter the right in an accounting to charge the Continental Company's interest with the reasonable cost of production. It further contends that, whether the instrument be construed as an assignment or as a mortgage, and whether passing an interest in realty or personalty, the cost of production was a charge upon the entire leasehold interest superior in law and in equity to that of the Continental Company.

The issues which we think controlling involve the proper construction of the assignment from the Oxford Company to appellant, and of the development agreement between the Oxford and Southern Companies.

[1, 2] We construe the former as passing an interest in realty, and not personalty. The' wording of the instrument is that of a general warranty deed. Its only language contended to express a contrary intention is that descriptive of the interest dealt with, namely, 25 per cent. of the production of oil from the lease. This is in effect that usually used in oil leases in retaining the royalty interest; as to which the test whether the lessor retains an interest in realty or personalty is made to depend upon whether he is to receive his share of the oil production in kind, or, at the lessee's option, in money. Hager v. Stakes, 116 Tex. 453, 294 S. W. 835; Stair v. Smith (Tex. Civ. App.) 299 S. W. 660.

[3] We also construe the instrument to be a mortgage and not an assignment. Although absolute in form, it was conclusively shown to have no other purpose than to secure the grantee in the payment of a debt and further advances. Beyond this the grantee had no interest in the thing granted. Instruments of this character, executed under such circumstances, are generally held to be mortgages only. Tittle v. Vanleer, 89 Tex. 179, 29 S. W. 1065, 34 S. W. 715, 37 L. R. A. 337; Ramirez v. Bell (Tex. Civ. App.) 298 S. W. 924. The distinguishing characteristic of instruments construed to be assignments, as pointed out in the Vanleer Case is that they "provided for an absolute distribution of all the proceeds of the sale left after paying said debt (that of the grantee), among creditors of the grantor,. thereby evidencing an intention to divest the grantor of all title and interest in said property." Here the instrument's sole purpose was to secure the claims of the grantee.

[4] The rule with reference to mortgages, which applies to those conveying mineral leases as well as generally, is that a grantee or assignee of the mortgagor, with notice of the mortgage, actual or constructive, takes subject and subordinate to the rights of the mortgagee. Atlas Supply Co. v. Bank of Commerce of Okmulgee, 101 Okl. 57, 223 P. 159; Landers v. Bank of Commerce of Okmulgee, 106 Okl. 59, 233 P. 200; Baxter v. Cherryvale, 111 Kan. 621, 208 P. 568; Gordon v. House, 201 Ky. 45, 255 S. W. 846.

[5] The Southern Company acquired' its interest in the lease and entered into a joint development agreement with the Oxford Company, with both actual and constructive notice of the Continental Company's claim, which the development agreement expressly recognized as a mortgage upon 25 per cent. of the production from the lease. Under these circumstances we do not see how any claim or equity in its favor arising by virtue of the development agreement could be held superior to the rights of appellant. And this, we think, is true, regardless of whether the instrument to the Continental Company be held a mortgage or an assignment. If the latter, it clearly contemplated development by the Oxford Company. This is necessarily implied from the language, "25 per cent. of the production of oil *to be produced by said Oxford Oil Company* under and by virtue of" the lease. Clearly this language precluded the Oxford Company from charging the interest of appellant with any claim arising out of the "production" under the lease. The Southern Company voluntarily entered into the joint development agreement with the Oxford Company in full recognition of appellant's rights, and in our opinion acquired no greater rights in lease than the Oxford Company had.

The trial court's judgment is reversed, and judgment is here rendered in favor of appellant against appellee for $19,642.91, with 6 per cent. interest per annum thereon from April 12, 1927, and all costs of suit.

Reversed and rendered.