Malcolm J. HENLEY and Mary K. Henley

v.

The UNITED STATES.

No. 193–65.

United States Court of Claims.

June 14, 1968.

Allen E. Pye, Tyler, Tex., attorney of record for plaintiffs. J. Robert Dobbs, Jr., Tyler, Tex., of counsel.

Knox Bemis, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

## OPINION

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

SKELTON, Judge.

This is an income tax case involving a mineral interest in land in Texas.* The plaintiffs, who are a husband and wife residing in Tyler, Smith County, Texas, seek to recover the sum of $25,024.98 (plus interest) as a partial refund of the income tax which they paid for the calendar year 1961. (The plaintiff Mary K. Henley is a party to the action only because she signed a joint income tax return with her husband for 1961.)

It is our opinion that the plaintiffs are not entitled to recover.

In 1961, the plaintiff Malcolm J. Henley was executive vice president of the Tyler Pipe & Foundry Company, of Tyler, Texas. However, he had for some time been interested in the oil business and had occasionally invested substantial sums of money in oil and gas deals, such as the purchase of royalty interests, participation in drilling operations, etc.

In their joint income tax return for 1961, the plaintiffs claimed a deduction in the amount of $30,210 for "dry hole expense" (i. e., the plaintiffs claimed that this amount had been expended by them during 1961 in unsuccessfully drilling for oil and gas). On auditing the plaintiffs' income tax return for 1961, the Internal Revenue Service disallowed the $30,210 deduction for "dry hole expense," and, on the basis of such disallowance, assessed against the plaintiffs an additional tax liability of $21,824.55, plus interest in the amount of $3,200.43. The plaintiffs paid the additional assessment and interest, totaling $25,024.98, and subsequently filed a timely claim for a refund of such amount. The Internal Revenue Service rejected the claim, whereupon the present suit was instituted by the plaintiffs.

In the present action, the plaintiffs do not contend that they incurred a "dry hole expense" of $30,210 during 1961. Instead, the plaintiffs allege in the petition that the amount of $30,210 which was claimed by them as a deduction and was disallowed by the Internal Revenue Service "represented the taxpayers' cost of their mineral interest in a tract of 1,070 acres * * *, which mineral interest became completely worthless during the calendar year 1961."

The 1,070-acre tract of land referred to in the petition is situated in the northern part of Smith County, Texas, and consists of the whole of the M. McDermott Survey (Abstract No. 726) and the whole of the S.A. & M.G.R.R.Co. Survey (Abstract No. 970). This tract is bordered on the north by the Sabine River; it is mostly low-lying, river-bottom land; and it is subject to occasional flooding by water from the Sabine River. At the time with which we are concerned in the present litigation, the land was unimproved and was completely covered with timber.

The 1,070-acre tract of land is contiguous to, and lies generally to the north of, another tract of land in Smith County, Texas, which contains approximately 505 acres and which was purchased in 1959 by the plaintiff Malcolm J. Henley. (For

* We are indebted to Commissioner Mastin G. White for his able statement of the facts from which we have borrowed extensively, and for his findings of fact which we adopt in their entirety. We arrive at the same conclusions as the commissioner, but by somewhat different routes.

the sake of convenience, the 505-acre tract of land will usually be referred to hereafter in the opinion as "tract 1," and the 1,070-acre tract of land will usually be referred to as "tract 2.")

Tract 1 and tract 2 lie generally in the East Texas oil and gas producing region, where production of oil and gas is obtained from different geological formations, particularly the Woodbine, the Paluxy, and the Rodessa, and in many different—and sometimes scattered—locations.

Sometime after the plaintiff Malcolm J. Henley (who, for the sake of convenience, will usually be referred to hereafter in the opinion as "Mr. Henley") acquired tract 1 in 1959, Jeff M. Bracken, who then owned tract 2, got in touch with Mr. Henley and inquired whether he would be interested in selling tract 1 to Mr. Bracken, or, in the alternative, whether Mr. Henley would be interested in buying tract 2 from Mr. Bracken. No contract resulted from this discussion.

Subsequent to the discussion referred to in the preceding paragraph, Frank G. Hill and wife acquired the ownership of tract 2. Mr. Hill thereafter approached Mr. Henley with a buy-or-sell proposition, under which Mr. Henley would either buy tract 2 from Mr. Hill and wife, or would sell tract 1 to the Hills. The discussion between Messrs. Hill and Henley took place on several occasions and extended over a period of time. Mr. Henley did not wish to sell tract 1; and, prior to July 1961, he was not particularly interested in acquiring tract 2.

In the early part of July 1961, Mr. Henley received confidential information to the effect that the Humble Oil & Refining Company was planning to drill an exploratory well (or to have such a well drilled) in a parcel of land within the James M. Rush Survey (Abstract No. 147), Smith County, Texas, which lies to the south of, and fairly close to, tract 2. After Mr. Henley ascertained that Humble was definitely going to drill in 1961 an exploratory well that was considered to be a "hot prospect"—but be-

fore Humble's plan to drill became general knowledge in the area—Mr. Henley began a serious effort to buy from Frank G. Hill and wife the minerals in tract 2, or, if necessary, the entire estate of the Hills in tract 2.

As of July 1961, Frank G. Hill and wife owned tract 2 in fee simple, except that one-half of the mineral royalty interest (i. e., one-half of a one-eighth interest in any minerals that the tract might contain) had been conveyed to and was permanently owned by another person, and except that an additional one-quarter of the mineral royalty interest had been reserved by a former owner of tract 2 until June 30, 1984. The Hills had the "executive rights" in the minerals (i. e., the right to drill for oil and gas in tract 2, the right to lease the land for oil and gas development, and the right to receive any bonus and rental payments in connection with such a lease). The fractions of the mineral rights which the Hills did not own were non-participating interests (i. e., the owners of such interests did not have any right to drill for oil and gas in tract 2, or to exercise any control over the leasing of the land for such development, or to receive any bonus or rental payments in connection with an oil and gas lease).

In addition to the outstanding mineral interests in tract 2 held by other persons as of July 1961 and referred to in the preceding paragraph, Frank G. Hill and wife had borrowed money from J. P. Rice and on July 30, 1960 had issued an oil and gas lease on tract 2 to Mr. Rice as security for the loan. The agreement between the Hills and Mr. Rice was to the effect that, upon the repayment of the loan secured by the oil and gas lease, Mr. Rice would relinquish or assign the lease to the Hills or their nominee.

On the basis of the confidential information which Mr. Henley received in July of 1961 relative to the prospective drilling of an exploratory well by the Humble Oil & Refining Company on nearby land, Mr. Henley broached to Frank G. Hill the subject of the possible purchase by Mr. Hen-

ley of the mineral interest in tract 2 owned by Mr. Hill and wife. Mr. Hill was unwilling to dispose of the mineral interest separate and apart from the surface of the land, but he was willing to sell the entire estate of the Hills in tract 2. Mr. Henley then began serious negotiations with Mr. Hill concerning the purchase of the Hills' entire estate in tract 2. The Hills' "asking price" was $70 an acre. However, as a result of the negotiations between Messrs. Henley and Hill, it was finally agreed that the Hills would sell, and that Mr. Henley and his wife would buy, tract 2 at a price of $50 an acre. The Hills were unaware at the time that the Humble Oil & Refining Company was going to drill an exploratory well on nearby land within the reasonably near future.

After consulting with his tax accountant, his banker, and his lawyer, Mr. Henley decided that it would be advisable: (1) to make an allocation of the lump-sum total price for tract 2 as between the mineral value, to which Mr. Henley allocated the sum of $30,210, and the surface value, to which he allocated the sum of $22,910.39; (2) to have Frank G. Hill and wife execute two deeds, one covering the minerals in tract 2 and the other covering the surface of tract 2; and (3) to issue two separate checks to the Hills in payment for tract 2.

At the request of Mr. Henley, Frank G. Hill and wife executed two separate deeds in August 1961 for the purpose of consummating the agreement relative to the sale and purchase of tract 2. One of the deeds was dated August 18, 1961 and conveyed to Mr. Henley and wife all of the oil, gas, and other minerals in tract 2 (with the exception of the one-half and the one-fourth mineral royalty interests previously mentioned as being held by other persons). The other deed was dated August 25, 1961 and conveyed tract 2 (with the exception of the oil, gas, and other minerals) to Mr. Henley and wife. Mr. Henley paid the Hills in the form of two checks, one dated August 18, 1961 for $30,210, and the other dated August 25, 1961 for $22,910.39.

In August 1961, J. P. Rice surrendered and assigned to Mr. Henley and wife the oil and gas lease on tract 2 that had been held as security for a loan from Mr. Rice to Frank G. Hill and wife, the loan having been repaid.

After Mr. Henley and wife bought tract 2 from Frank G. Hill and wife, the Humble Oil & Refining Company drilled its exploratory well in the vicinity of tract 2, as planned. The drilling was begun in September 1961. The name of this well was the Gist No. 1 Barr. It was drilled within the James M. Rush Survey at a location that was 6,600 feet south of the southern boundary line of tract 2 at the nearest point.

Prior to 1961, the Humble Oil & Refining Company had obtained oil and gas leases on various lands in the George Taylor Survey (Abstract No. 996), in the Julio Lazarin Survey (Abstract No. 555), in the John Ellison Survey (Abstract No. 344), in the James M. Rush Survey previously mentioned, and in the Rebecca Keys Survey (Abstract No. 550), all of which are in Smith County, Texas, and lie to the south of and reasonably close to tract 2 (two of the surveys are contiguous to tract 2). Humble obtained these leases because its geologists had postulated a horst running southwest-northeast through the surveys just named and also through a portion of the S.A. & M.G. R.R. Co. Survey, which is part of tract 2. A horst is an upthrown block of subsurface formation between two parallel faults. The Gist No. 1 Barr well was drilled within the boundaries of the postulated horst, primarily to test the theory concerning the existence of a horst in the area.

The Gist No. 1 Barr well was drilled to a depth of 6,324 feet. It penetrated the Woodbine formation, but the lower Paluxy and Rodessa formations were not reached. No oil or gas was encountered. The formations penetrated by the Gist No. 1 Barr well did not run abnormally high, as they would have done if the postulated horst had existed. Thus, the test well showed that the postulated horst did not exist below the site of the Gist No. 1

Barr well. Because of the unfavorable results of the test drilling, the Gist No. 1 Barr well was plugged and abandoned as a "dry hole" in October 1961. Furthermore, since the Gist No. 1 Barr well was not only a "dry hole" with respect to the Woodbine and shallower formations, but demonstrated that the postulated horst did not exist, the Humble Oil & Refining Company concluded that there was no reasonable prospect of producing oil or gas in commercially profitable quantities from any of the lower formations under the lands in the vicinity of the Gist No. 1 Barr well. Consequently, Humble dropped its oil and gas leases on lands in the George Taylor Survey, in the Julio Lazarin Survey, in the John Ellison Survey, in the James M. Rush Survey, and in the Rebecca Keys Survey, by failing to pay the next delay rentals when they became due in January 1962.

Subsequent to the time when the Gist No. 1 Barr well on nearby land was abandoned as a "dry hole" in October 1961, no one has offered to lease tract 2 for oil and gas development, or to purchase the mineral interest owned by Mr. Henley and wife in tract 2.

It is upon the basis of the facts previously summarized in this opinion that Mr. Henley and wife contend in the present litigation that they were entitled to take an income tax deduction in the amount of $30,210 for 1961 because "their mineral interest in a tract of 1,070 acres * * * became completely worthless during the calendar year 1961."

One problem in the present case is to determine whether the evidence in the record sustains the allegation in the petition to the effect that the mineral interest owned by Mr. Henley and wife in tract 2 became worthless during the calendar year 1961.

██ The question of whether an item of property became worthless during a particular tax year is a factual issue, as to which the burden of proof is borne by the taxpayer who claims an income tax deduction on that basis. Boehm v. Commissioner of Internal Revenue 326 U.S. 287, 293–294, 66 S.Ct. 120, 90 L.Ed. 78 (1945); James Petroleum Corp., 24 T.C. 509, 518 (1955), affirmed 238 F.2d 678 (2d Cir. 1956), cert. denied, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957).

As indicated earlier in this opinion, there was no drilling for oil and gas on tract 2 during 1961, or thereafter. However, the Gist No. 1 Barr well was drilled to a depth of 6,324 feet at a location 6,600 feet south of the southern boundary line of tract 2. The Gist No. 1 Barr well was not only a "dry hole" with respect to the formations which it penetrated—including the Woodbine, known to be productive in other parts of the East Texas oil and gas producing region—but this well also revealed the absence of any structural abnormalities that would suggest a reasonable prospect of oil or gas being encountered at that location in formations below the Woodbine, such as the Paluxy or the Rodessa. Because of the unfavorable results from the drilling of the Gist No. 1 Barr well, the Humble Oil & Refining Company concluded that its oil and gas leases on lands in the vicinity of tract 2 were worthless, and dropped such leases by failing to pay the annual delay rentals when they became due on January 1, 1962.

██ Furthermore, the evidence in the record indicates that the geology of tract 2 was less favorable for oil and gas development than the geology of the land where the Gist No. 1 Barr well was drilled. Therefore, a finding is warranted that a reasonably prudent and well informed oil and gas operator would have concluded, as of the latter part of 1961, that neither oil nor gas would ever be produced in commercially profitable quantities from the Woodbine formation or any of the shallower formations under tract 2, and that there was no reasonable prospect of either oil or gas ever being produced in commercially profitable quantities from any of the formations under tract 2 lying below the Woodbine. On the basis of such a finding, it must be determined that the mineral interest of Mr. Henley and wife in tract 2 became worthless dur-

ing the latter part of 1961. In oil and gas country, it is the reasonable prospect, in the opinion of prudent and knowledgeable oil and gas operators, of oil or gas being produced in commercially profitable quantities from a particular tract of land that gives value to the mineral interest in such land.[1] Pool v. United States, 119 F.Supp. 202, 203–204, 127 Ct.Cl. 549, 552–553, (1954); C. C. Harmon, 1 T.C. 40, 56 (1942), affirmed (on other grounds) CIR v. Harmon, 139 F.2d 211 (10th Cir. 1943), reversed (on other grounds) 323 U.S. 44, 65 S.Ct. 103, 89 L. Ed. 60 (1944); Harvey A. Heller, 1 T.C. 222, 224 (1942); James Petroleum Corp., supra, 24 T.C. at pages 523–524.

■ Of course, the drilling of the Gist No. 1 Barr well on nearby land and its abandonment as a dry hole in 1961, and the relatively less favorable geology of tract 2 for oil and gas development in comparison with the geology of the land where the Gist No. 1 Barr well was drilled, did not definitely establish the nonexistence of oil and gas in tract 2. However, we are concerned in the present case with the situation as it reasonably appeared to be during the latter part of 1961 concerning the future prospect of oil or gas being produced in commercially profitable quantities from tract 2. For the purpose of establishing the worthlessness of the mineral interest in tract 2 at the time in question, it was not necessary for Mr. Henley and wife to prove definitely that there was no oil or gas in tract 2, and that the mineral interest in tract 2 would be forever unproductive of income. Pool v. United States, supra, 119 F.Supp. at page 204; 127 Ct.Cl. at page 553; C. C. Harmon, supra, 1 T.C. at page 58.

■ It is the practical worthlessness of the mineral interest in tract 2 during the latter part of 1961, and not the bare possibility of what might happen at some uncertain time in the future, that is determinative of the factual issue in the present case, Chaparral Oil Co., 43 B.T.A.

457, 461 (1941), petition for review dismissed, C. I. R. v. Chaparral Oil Co., 122 F.2d 933 (10th Cir. 1941). As the Supreme Court once said, the tax laws do not require a taxpayer to be an incorrigible optimist. United States v. S. S. White Dental Co., 274 U.S. 398, 403, 47 S.Ct. 598, 71 L.Ed. 1120 (1927).

It should be mentioned that there is evidence in the record to the effect that, during the period October 1962—July 1965, oil and gas operators displayed interest in obtaining oil and gas leases on certain other lands in the vicinity of tract 2, and that bonuses ranging between $15 and $25 per acre were paid in connection with the procurement of some such leases (see finding 18). However, such evidence concerning subsequent developments does not necessarily refute the conclusion that, as a practical matter, the mineral interest in tract 2 was worthless as of the latter part of 1961. James Petroleum Corp., supra, 24 T.C. at page 524. This is especially so in view of the circumstance that the only well drilled pursuant to such a lease was a "dry hole," although it penetrated the Paluxy formation, and the further circumstance that the geology of tract 2 was less favorable for oil and gas development than the geology of the other nearby lands referred to in this paragraph.

The statutory provision involved in the present litigation is Section 165(a) of the Internal Revenue Code of 1954 (68A Stat. 49), reading as follows:

(a) General Rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

The statutory provision quoted in the preceding paragraph has been supplemented by administrative regulations, which provide in part as follows:

(b) *Nature of loss allowable.* To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions,

---

1. The evidence does not indicate that tract 2 has any value for minerals other than oil and gas.

fixed by identifiable events, and * * actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss. [26 CFR § 1.165–1(b).]

Although it has been concluded in the preceding part of this opinion that the mineral interest of Mr. Henley and wife in tract 2 became worthless, as a practical matter, during the latter part of 1961, the evidence in the record fails to show that the entire estate of the Henleys in tract 2 became worthless in 1961. On the contrary, a finding is warranted that the estate of the Henleys in tract 2, considered as a single unit, had substantial value at all times during 1961. Therefore, the crucial legal question in the present case is whether the mineral interest owned by the Henleys in tract 2 can be segregated from their other rights in tract 2, so that the practical worthlessness of the mineral interest during the latter part of 1961 can properly be regarded as constituting a "loss" for the purpose of Section 165(a) of the 1954 Code and the related administrative regulations.

In the present case, the evidence shows that Mr. Henley, when he became seriously interested in tract 2, was motivated primarily by a desire to obtain the mineral interest in tract 2. However, Frank G. Hill, who then owned the fee with his wife, was unwilling to dispose of the mineral interest separate and apart from the surface of the land. Consequently, Mr. Henley was compelled, if he wished to obtain the mineral interest, to negotiate for the purchase of the entire estate owned by Mr. Hill and wife in tract 2. The result of the negotiations was an agreement that the Hills would sell, and that Mr. Henley and his wife would buy, the entire estate owned by the Hills in tract 2 at a price of $50 per acre.

It will be recalled that, at the request of Mr. Henley, Frank G. Hill and wife executed two separate deeds for the purpose of consummating the agreement relative to the sale and purchase of tract 2, one of the deeds conveying to the Henleys the mineral interest in tract 2 owned by the Hills and the other deed conveying to the Henleys all the other rights owned by the Hills in tract 2; and that Mr. Henley paid the Hills in the form of two checks, one purporting to be compensation for the mineral interest and the other purporting to be compensation for the remainder of the rights in tract 2.

I

*There was no Severance of the Mineral and Surface Estates because of the Agreement of the parties*

In our opinion, the fact that one deed was executed for the minerals and another for the surface at the request of Henley does not change the agreement or the intention of the parties. This was merely the mechanical device selected by Henley and used to carry out their agreement and intention. Hill was unwilling to separate the minerals from the surface by selling only the minerals. Henley himself testified that Hill wanted to "sell the entire business," "the whole deal," "the whole ball of wax," "the entire bunch," "the entire bundle," "everything," and "$50.00 an acre across the board for the minerals and the transaction." (Tr. 14, 15, 20, 29, 31.) He further testified that he agreed "to buy the land and the minerals in one lump sum, and then allocate the values," "to buy the minerals and the land in one transaction," "to pay $50.00 for the minerals and the land at one time," and, also, "that Hill's proposition to him was a sale of the land, both surface and minerals, for $50.00 per acre," and "he [Hill] said he could not sell it except in a bundle." (Tr. 15, 29, 310) Hill testified that the final deal was "$50.00 across the board for everything." (Tr. 103.) Hill further testified that the separate deeds for the minerals and the surface was Henley's idea. (Tr. 104.)

These facts show that Hill would not agree to sell the minerals separate from the surface, and that the parties agreed that Hill would sell and Henley would buy the minerals and the surface "at one time," in "one bundle or bunch"

and as "one ball of wax" for $50 per acre. This was their intention and this was their agreement. The mechanics of the transaction is immaterial. It is the law in Texas, as well as most other jurisdictions, if not all of them, that the courts should ascertain and give effect, whenever possible, to the true intention of the parties. Fortner v. Johnson, 404 S.W.2d 892,900 (Tex.Civ.App.1966), writ of error refused n. r. e.; Rio Bravo Oil Co. v. Weed, 121 Tex. 427, 50 S.W.2d 1080, 1087, 85 A.L.R. 391 (Tex.1932), cert. denied, 288 U.S. 603, 53 S.Ct. 387, 77 L.Ed. 978 (1933).

█ It is clear that the intention of the parties was that both the surface and the minerals were to be sold by Hill to Henley at one time for the total sum of $50 per acre. There was to be no separation of the minerals from the surface, as Hill had positively refused to sell them separately and Henley agreed he would buy them together as one entire estate for the fixed price of $50 per acre in one transaction. Under these circumstances, and giving effect to the intention of the parties, there was no separation of the minerals from the remainder of the estate (the surface).

## II
### The Mineral and Surface Interests in Texas

█ This is a Federal tax case. In such a case, where Federal tax liability turns upon the character of an interest in property, the nature of that interest rests on state law as determined by the highest court of the state. Commissioner of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). Since this is a Texas case, the laws of Texas control the solution of the questions here presented. Davis v. Atlantic Oil Producing Co., 87 F.2d 75, 76 (5th Cir. 1936).

█ This brings us to a discussion of the mineral interest as distinguished from the fee or surface interest in land according to Texas law. Since Texas became a state, the ownership of land extends from the surface to the center of the earth, including everything found within those dimensions. Comanche Duke Oil Co. v. Texas Pacific Coal & Oil Co., 298 S.W. 554 (Tex.Com.App.1927). A deed conveying the entire fee simple title to land also conveys the oil and gas and all other minerals beneath the land, even though such minerals are not mentioned in the deed. Vogel v. Allen, 118 Tex. 196, 13 S.W.2d 340 (1929); Sharp v. Fowler, Tex.Civ.App., 248 S.W.2d 322, aff'd, 151 Tex. 490, 252 S.W.2d 153 (1952); Garvin v. Hudson, 353 S.W.2d 508 (Tex.Civ.App.1962), writ of error refused n. r. e.; Japhet v. McRae, 276 S.W. 669 (Tex.Com.App.1925); Hill v. Roberts, 284 S.W. 246 (Tex.Civ.App. 1926); and Bibb v. Nolan, 6 S.W.2d 156 (Tex.Civ.App.1928). Oil and gas in place are realty and are subject to ownership. Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717, L.R.A.1917F, 989 (1915). They may be severed from the surface above them by an oil and gas lease, a decree of court, a reservation or exception, or by a mineral deed. The mineral estate may be one for years, for life, in fee simple, or a determinable fee. See Texas Co. v. Daugherty, supra; Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S.W. 296, 29 A.L.R. 607 (1923); Lemar v. Garner, 121 Tex. 502, 50 S.W.2d 769 (1932); Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 29 A.L.R. 566, 254 S.W. 290, 292 (1923). Accordingly, minerals, such as oil and gas, may be owned, sold, and enjoyed in Texas separate and apart from the surface of the land.

From these authorities, it is at once apparent that Hill could have separated the minerals from the surface in the land in question by selling the minerals to Henley and keeping the surface for himself. Alternatively, he could have sold Henley the surface and kept the minerals by excepting them from the deed. But Hill was not willing to sell the minerals without selling the surface, so Henley bought both. There was no separation of the minerals from the surface, because this was not the intention of the parties nor their agreement.

Tract 2 as a whole did not become worthless at any time during 1961. Of course, tract 2 did become worthless for a particular use—i. e., for oil and gas development—during the latter part of 1961. However, the statutory provision involved here does not contemplate the deduction of losses resulting from mere fluctuation in the value of property. United States v. S. S. White Dental Co., supra, 274 U.S. at page 401, 47 S.Ct. 598. Accordingly, the fee owner of land is not entitled to take a loss deduction because his land became worthless for oil and gas development during a particular year due to the drilling of a "dry hole" on his own land (Louisiana Land & Exp. Co. v. Commissioner of Internal Revenue, 161 F.2d 842, 844 (5th Cir. 1947); Price v. United States, 260 F.Supp. 18, 21 (W.D.Okl.1966)) or on nearby land (Coalinga-Mohawk Oil Co. v. Commissioner of Internal Revenue, 64 F. 2d 262, 263 (9th Cir. 1933), cert. denied, 290 U.S. 637, 54 S.Ct. 54, 78 L.Ed. 553; Fred C. Champlin, 1 B.T.A. 1255 (1925)). For the owner of the fee, the loss of a single land use during a particular tax year does not provide a "closed and completed" transaction with respect to his entire estate in the land, as required under the administrative regulations previously quoted. These regulations, in substantially the same form, have been in effect for many years, and they are deemed to have received the approval of Congress and to have the effect of law. Boehm v. Commissioner, supra, 326 U.S. at pages 291–292, 66 S.Ct. at page 120.

## III
### Shrinkage in Value of Land Without Total Loss is not Deductible From Income Taxes

This case is much like the Louisiana Land case, supra, and the Price case, supra. In both of those cases the taxpayers bought the entire fee simple estate in the land (which included the minerals) and then allocated a part of the purchase price to the minerals and the balance to the surface. When the minerals proved to be worthless, the taxpayers sought to deduct the value they had put on the minerals from their income tax (as here). The court disallowed the deduction on the theory that the surface and the mineral estates had never been separated and since the surface still had value, there had not been a total loss to the taxpayer within the meaning of the regulations, but had only been a shrinkage in the value of the total estate, which was not deductible. In other words, there was not a closed and completed transaction in those cases. It is not permissible to allow a taxpayer a deduction for the loss of each separate use to which he may put his land. The whole property must become worthless in order for the deduction to be allowed.

In our case, since we have held that there was no separation or severance of the minerals from the surface, the loss of the value of the minerals did not entitle Henley to a deduction because the remainder (surface) still had value. Consequently, there was no total loss of the property, but merely a shrinkage in value of the whole estate. There was no "closed and completed transaction" within the meaning of the regulations that entitled him to a tax deduction.

## IV
### If the Mineral and Surface Estates were Severed, They Later Merged or were Reunited In a Single Ownership

The plaintiffs argue strenuously that the minerals were separated from the surface because of the two deeds, one for the minerals and one for the surface, and because separate checks were given for each. We do not agree for reasons stated above. However, if, arguendo, it could be said that there was a separation of the minerals from the surface, it would not profit the plaintiffs, because under the circumstances of this case, the mineral estate and the surface estate merged or became reunited in the plaintiffs upon the delivery to them of the two deeds. They thus became the owners of the mineral estate which merged or reunited with the surface estate into a fee simple title that was no longer separated into the two estates. See West v. Hap-

good, 141 Tex. 576, 174 S.W.2d 963 (1943); Jones v. McFaddin, 382 S.W.2d 277 (Tex.Civ.App.1964), writ of error dismissed, appeal dismissed, 382 U.S. 15, 86 S.Ct. 56, 15 L.Ed.2d 11 (1965); Sharp v. Fowler, supra; West v. Seigler, 265 S.W.2d 618 (Tex.Civ.App.1954), writ of error refused n. r. e.; Hoover v. General Crude Oil Co., 206 S.W.2d 139 (Tex.Civ. App.1947), reversed on other grounds, 147 Tex. 89, 212 S.W.2d 140 (1948); Amaya v. Sun Oil Co., Civil Action No. 664 (Memorandum Opinion unreported S.D.Tex. June 8, 1950); Amaya v. Hewitt & Daugherty, Civil Action No. 663 (Memorandum Opinion unreported S.D. Tex. June 16, 1950).

There is some conflict of authority on the question of merger of a once severed mineral estate with the surface estate when they later come together in the same ownership. For this reason, we will discuss the cases bearing on the question at some length.

In West v. Hapgood, supra, the grantor was a syndicate which sold land in Texas and at the time of the conveyance, separated the minerals from the surface by reservation and exception of the minerals in the deed. According to Texas law, as pointed out above, the deed only conveyed the surface estate to the grantee and the mineral estate remained in the grantor syndicate. A short time later, the syndicate executed and delivered an instrument to the grantee in which it "released" all of the minerals it had reserved in the deed. The grantee went into possession of the land immediately (in 1882), and he and his successors in title had possession of it up to the time of trial. In 1905, the receiver of the syndicate sold "all lands and interests in lands in Texas owned by the syndicate remaining undisposed of an unsold" to the predecessor in the title of the plaintiffs for $100. Thereafter, plaintiffs sued the defendants, who were the successors in title of the original grantee, for the title to the oil and gas and other minerals under the land. Plaintiffs contended that the minerals were severed from the surface in the original deed and that the later "release" of the minerals by the grantor to the grantee was insufficient to convey the minerals to the grantee, and, consequently, the mineral estate remained in the grantor and passed to plaintiffs when they bought "all unsold land and interests in land owned by the syndicate" from the receiver of the syndicate for $100.

The defendants claimed title to the minerals under the original deed and the release and under the twenty-five year statute of limitations.[2] They proved they had been in possession of the surface of the land for more than twenty-five years. To acquire a limitation title to the minerals under this statute, defendants had to be in possession of the minerals under a recorded deed purporting to convey the minerals. They contended that the release purported to convey the minerals, and that their adverse possession of the surface under these circumstances, constituted adverse possession of the minerals.

Under Texas law, adverse possession that is begun before there has been a severance is adverse possession of the minerals as well as the surface. Watkins v. Certain-Teed Products Corp., 231 S.W.2d 981 (Tex.Civ.App.1950); Carminati v. Fenoglio, 267 S.W.2d 449 (Tex.Civ.App.1954), writ of error refused n. r. e. On the other hand, adverse possession of the surface that is begun after there has been a severance of the surface and mineral estate is not adverse possession of the mineral estate. Grissom v. Anderson, 125 Tex. 26, 79 S.W.2d 619 (1935); Elliott v. Nelson, 113 Tex. 62, 251 S.W. 501 (Tex.Com.App.1923); Weems v. Hawkins, 278 S.W.2d 439 (Tex. r. e.; Rio Bravo Oil Co. v. McEntire, 128 Civ.App.1954), writ of error refused n. Tex. 124, 95 S.W.2d 381, 128 Tex. 124, 96 S.W.2d 1110 (Tex.1936). In the latter case, in order to have adverse possession of the severed mineral estate, there must be an actual taking of possession of the minerals by drilling op-

---

2. Articles 5519 and 5519a, Revised Civil Statutes of Texas of 1925, as amended.

erations or by the production of oil or gas. Kilpatrick v. Gulf Production Co., 139 S.W.2d 653 (Tex.Civ.App.1940), writ of error dismissed; Crawford v. Humble Oil & Refining Co., 150 S.W.2d 849 (Tex. Civ.App.1941), writ of error dismissed; Webb v. British American Oil Producing Co., 281 S.W.2d 726 (Tex.Civ.App.1955), writ of error refused; 3 Am.Jur.2d § 222, annot., 35 A.L.R.2d 179; Lyles v. Dodge, 228 S.W. 316 (Tex.Civ.App. 1921); Saunders v. Hornsby, 173 S.W.2d 795 (Tex.Civ.App.1943), writ of error refused w. m.

In West v. Hapgood, there had not been any actual possession of the minerals separate and apart from the possession of the surface, as there had been no drilling operations nor production of minerals from the land. The only possession defendants could show was that of the surface. The Supreme Court said:

> * * * if the release * * * did not reunite the surface estate and the mineral estate, the possession of the surface by * * * [the grantee] and his successors in title was not possession of the minerals. Id. at 966.

In that case, the Court of Civil Appeals did not decide whether or not the release was effective to convey the reserved minerals to the grantee. It did hold, however, that the grantee and his successors in title (defendants) had good title to the minerals by virtue of Article 5519, because the grantee took possession of the land under the deed, which conveyed the surface, and under the release, which purported to convey the minerals, and he and his successors in title had thereunder peaceable and adverse possession for more than twenty-five years prior to the filing of the suit. It further held that defendants "should recover under the provisions of Article 5519a." Id. at 966.

This decision by the Court of Civil Appeals was based strictly on limitations. Since defendants had never had actual possession of the minerals by drilling operations or production, their possession of the minerals occurred by reason of their possession of the surface, which had been reunited with the minerals by the release and which purported to convey the minerals.

The Supreme Court affirmed the judgment of the Court of Civil Appeals. In its opinion, the Supreme Court did not write on the question of limitations, other than to aprove the decision of the lower than to approve the decision of the lower court based on that theory. In fact, it said that the trial court should have instructed a verdict for the defendants on another ground. However, it did not disturb the opinion of the lower court nor disapprove it, but expressly affirmed it. It appears from its opinion that it looked with favor upon defendants title by possession when it said:

> * * * There has been no actual possession of the minerals, but * * * [the grantee] and his successors in title have consistently made the same claims of title and have exercised the same dominion over the land as those which ordinarily are made and exercised by land owners when there has been no severance of the mineral estate from the surface estate. Id. at 967.

While the court did not expressly say what the "other ground" was that entitled defendants to judgment, by implication it can be concluded that it was referring to the reuniting of the surface and mineral estates by the release. This may be inferred from the following quotations, from the court's opinion:

> The facts * * * all lead in our opinion to no other reasonable inference or conclusion than that the syndicate [grantor] had divested itself of title to the minerals in this land. Id. at 970.

Finally, the court said:

> The presumption indulged is, in our opinion, * * * that Jordan and Ferguson, [trustees of the syndicate and partners owning interests in the beneficial title representing the grantor] after determining, in the exercise of their discretionary power, * * * [grantee] should be invested *with the*

*entire estate or interest in the land, the minerals as well as the surface,* authorized \* \* \* [the attorney in fact] to carry out their determination by executing and delivering the release of the minerals. Id. at 971 [Emphasis supplied.]

It will be noted that in the quotation from the opinion above, that the court refers to the *entire estate or interest in the land* (singular) and not to the entire *estates* or *interests* in the land (plural), and follows with the words "the minerals as well as the surface." Thus the court treats the surface estate and the mineral estate as *one estate* after they have been reunited by the release of the mineral estate to the owner of the surface estate.

The court used the word "reunited" in speaking of the coming together in the grantee of the once severed mineral estate and surface estate, instead of saying they were "merged." Nevertheless, the net effect is the same. It could be said that there was a unity of possession in the grantee of the mineral estate and the surface estate, which has the same effect, at least in the case before us, as a merger or a reuniting of the two estates.

An interesting Texas case on the question of merger is Jones v. McFaddin, supra. In that case, the land involved was owned at one time by Spain. The court held that the Crown of Spain segregated the minerals from the surface by the Mining Ordinance of May 22, 1783, and that when the Republic Of Mexico gained its independence from Spain, it adopted and recognized the Mining Ordinance of 1783 of the Sovereign of Spain. Coahuila and Texas became a republic on March 24, 1825, according to the colonization law of Mexico, and on February 14, 1835, it issued a patent to eight labors[3] of land to Pelham Humphries, the predecessor in title of defendants. Pelham Humphries sold the land on February 14, 1836, to McFaddin's predecessors in title. On March 2, 1836, Texas gained its independence and became the Republic of Texas. The court stated that Texas adopted, recognized, and applied the Mining Ordinance of 1783, issued by King Charles III of Spain, as the law of the land. Texas became one of the states of the United States on December 29, 1847. In 1866, the State of Texas adopted the Constitutional Relinquishment Act, Article VII, Sec. 39, whereby it relinquished to the owners of the soil all mines and minerals on their land. The defendant, McFaddin, purchased the land in question from the successors in title of Pelham Humphries, the original patentee, in 1883, and promptly enclosed it with a fence and had possession of it for more than 75 years before the suit was filed. Prior to 1901, McFaddin issued an oil and gas lease on the land and in 1901, the famous Spindle-top oil well "blew in" and there has been production of oil therefrom ever since. The plaintiffs in the case were the three thousand heirs of Pelham Humphries, the original patentee of the land. They sued *McFaddin* and three hundred defendants, claiming that they were the owners of the mineral estate in the land and alleging that defendants had removed and marketed minerals from the land of the value of one-half billion dollars.

The plaintiffs in that case contended that there were two separate and distinct estates, namely the surface estate and the mineral estate, and that *McFaddin* and his predecessors in title had never had title to the mineral estate because it had been severed from the surface by Spain, Mexico, and Texas, as stated above. The defendants asserted title to the mineral estate by limitations and adverse possession.

The court in that case held that the mineral estate and the surface estate *merged* as a result of the Constitutional release of 1866 by the State of Texas. The Court said:

> We hold that as a result of the Constitutional Release of 1866 of the

3. A "labor" of land is an old Texas land unit of approximately 177 acres.

minerals to the owners of the soil, that *the minerals and the soil became merged into a general title,* and if necessary, is subject to limitation title by possession of the minerals in this case. There has actually been possession of the minerals since the year 1901, and the holders of the minerals have acquired title by limitation. Id. at 280. [Emphasis supplied.]

█ While there may be some difference of opinion as to whether Spain, Mexico, and Texas actually severed the minerals from the surface,[4] that question is not before us in the instant case and we are not called upon to decide it. For the purposes of this case, we must accept the decision of the Texas court that the minerals were severed from the surface by the various sovereignties mentioned above. The holding of the court in that case is a clear-cut decision that where the mineral estate has been severed from the surface estate, and both estates come together later on in the same person, they merge into one general fee simple title, notwithstanding any technical common law argument to the contrary. If this were not so, most land titles in Texas would be defective as to mineral estates, because most deeds that have been executed and delivered since the adoption of the Relinquishment Act of 1866 have merely described the land by metes and bounds or by lot and block number in a certain survey in a named county, without any mention of the minerals. Yet the courts of Texas have uniformly held that these deeds convey the surface as well as the minerals. See Vogel v. Allen, supra; Sharp v. Fowler, supra, and other cases cited above for this proposition.

The case of Sharp v. Fowler, supra, is squarely in point on the question of merger. There the minerals had been severed from the surface by a reservation in a deed. Later on, one Cockrell acquired the minerals in one deed, and the surface in a separate deed. There was a period of about seven months between the two deeds. Cockrell then sold three-fourth of the minerals to third parties, keeping one-fourth of the minerals and the surface. At this point, he died. His administrator sold the land to Browning and Browning sold it to defendant, *Fowler.* The deeds of the administrator and of Browning did not mention the one-fourth mineral interest which Cockrell's estate still owned in the land. Their deeds conveyed the land by giving the acreage (29.7 acres), together with the name of the survey and county and further described it by reciting that it was the same land described in a certain deed in the prior chain of title, giving the names of the grantor and grantee, the date and volume and page number of the recordation of the prior deed. The prior deed referred to was one in which all the minerals were excepted and only the surface was conveyed. The question in the case was whether the deeds from the administrator and from Browning conveyed the one-fourth mineral interest owned by Cockrell's estate, since no mention had been made of this mineral interest in the deeds, and bearing in mind that the minerals had at one time been completely separated from the surface. The court held that the deeds did convey the one-fourth mineral interest along with the surface because the two estates had become merged when Cockrell acquired both of them. On this connection, the Court of Civil Appeals said:

We conclude, then, that the * * * *surface estate and the mineral estate were merged* when the * * * [grantor] in their last deed to Cockrell conveyed to him the mineral estate in the 29.7 acres of land and that the reference * * * [to the prior deed] was for the purpose of describing the tract of land conveyed and in no wise limited the estate conveyed by said deeds. 248 S.W.2d 322, 324 (Tex.Civ. App. 1952). [Emphasis supplied.]

4. See United States v. Northern Paiute Nation, Ct.Cl., 393 F.2d 786, decided April 19, 1968.

The Supreme Court affirmed the judgment in the above case, but did not specifically mention merger. However, the language in its opinion shows unmistakably that it did consider that the mineral and surface estates had merged. In speaking of whether there was any implication that only the surface was being conveyed in the deed, the court said:

* * * That implication, if in fact it be one, should not be held to overcome the unconditional grant of land expressed in other language, in that deed, and limit that grant to the surface of the land. From a consideration of the * * * deed in all its parts, it is our conclusion that its language evidences no intention to reserve the ¼th mineral interest owned by the Cockrell estate. 151 Tex. 490, 252 S.W.2d 153, 154 (1952).

The above case last cited appears to be "on all fours" with the case at bar on the question of merger, if it be conceded for the purposes of argument that there was a severance of the mineral and surface estates in the instant case. On that premise, we see that there was a severance of the estates in both cases and when the same person acquired both estates, they merged into one title.

The plaintiffs in the instant case do not agree that the two estates have merged. They say that once the mineral estate has been severed from the surface estate, the two cannot thereafter merge even if both are owned by the same person. They cite Humphreys-Mexia Co. v. Gammon, supra, in support of their position. While there is dicta in that opinion that gives some comfort to plaintiffs' contention in this regard, the dicta was totally unnecessary for the decision of the case. The facts in that case were entirely different from those in the instant case. In that case, the grantor reserved the minerals in a deed by which he conveyed the surface to one Sanches, retaining a vendor's lien on the land so conveyed to secure the payment of purchase money notes for the land. Later on, the grantor transferred the notes and liens securing the same to plaintiffs, and thereafter, Sanches conveyed the land to plaintiffs in satisfaction of the notes. Plaintiffs contended that under these circumstances, the minerals were not separated from the surface by the grantor's deed to Sanches, and that the mineral estate which was reserved to the grantor was merged with the surface estate because of the legal title which was reserved by the grantor to secure the vendor's lien notes. The defendant claimed title to the minerals under the original exception of the minerals by the grantor in the deed to Sanches.

The court held in that case that the reservation in the deed separated the minerals from the surface and that the doctrine of merger could not apply because: (1) the grantor did not hold both the title to the minerals and the legal title to the land to secure the notes in his own right, because the legal title was held by him as trustee for the holder of the notes, and in order for merger to occur, it is necessary for one person to hold both estates in the same right; (2) there could not be a merger because there was an intermediate estate of Sanches and his successors in title holding the equitable title and possession of the land; and (3) there was never any intention of the parties that the two titles would merge after the execution and delivery of the original deed.

It is at once apparent that the facts in that case are readily distinguishable from those in the instant case, and the decision is not persuasive in support of plaintiff's contention of non-merger in the case before us.

On the question of when a merger can occur, the court said:

* * * According to the common law, by which we must be guided, in order that a merger may occur, it is ordinarily necessary that one person hold the two estates in the same right; and, consequently, if he holds one in behalf of himself, and the other for another, then there can be no merger. Id. at 302.

The court in that case unfortunately used other language by way of dicta on the question of merger that was unnecessary for the decision that has caused some confusion in some of the later cases on the subject. For instance, it said that the merger doctrine could not apply to that case, because it only applies to a situation where the original fee simple title may have been divided, as an estate for years or for life, and not to the different horizontal or vertical divisions of the land. This has been considered by some jurists and writers as authority for the proposition that once the mineral estate and the surface estate have been severed, they cannot thereafter merge. Some of the cases following this line of reasoning that might be mentioned are Joyner v. R. H. Dearing & Sons, 112 S.W.2d 1109 (Tex. Civ.App.1937 (dicta)); Beeler v. Harbour, 116 S.W.2d 927 (Tex.Civ.App. 1938), writ of error refused, n. r. e. (involved merger of title of vendor's lien with fee title); Ferguson v. Ragland, 243 S.W. 721 (Tex.Civ.App.1922), writ of error refused n. r. e. (no merger on assignment of leasehold estate to lessor when lessor had option to surrender assignment within 30 days for $3,000 cash).

One law review writer and prominent Texas lawyer, in commenting on statements in Humphreys-Mexia Co. v. Gammon, supra, on merger said:

> * * * the court in Humphreys-Mexia Co. v. Gammon stated that minerals so reserved were "severed" from the superior vendor's lien retained by the grantor. From this statement a text writer and a law review writer *have erroneously concluded that the right to severed minerals could never merge with the remaining title.* * * * if the owner of the surface re-acquires the severed minerals, adverse possession by a stranger begun thereafter would be adverse to all of the mineral rights owned by the surface owner.[5]

[Emphasis supplied.]

To put it another way, this writer says, in effect, that severed mineral and surface estates will merge when reunited in the same owner. Otherwise, adverse possession of the surface by a stranger after the owner of the surface re-acquires the mineral estate could not be adverse to the mineral rights of the surface owner. There would have to be a merger of the two estates before adverse possession of the surface would also be adverse possession of the minerals, in the absence of drilling for or production of oil or gas from the land sufficient to constitute *actual* possession of the minerals.

A number of text writers, law review writers, and legal encyclopedias make statements to the effect that severed surface and mineral estates cannot thereafter merge. All of them cite Humphreys-Mexia v. Gammon, supra, as authority for this proposition. See Thuss, Texas Oil & Gas, 2d ed., p. 29; Kuntz, Oil and Gas (A Revision of Thornton, 79 (1962)); 58 C.J.S. § 162; 28 Am.Jur.2d § 377; Masterson, Adverse Possession and the Severed Mineral Estate, 25 Texas Law Review, 139 (1946); and McElroy, Adverse Possession of Mineral Estates, 11 Baylor Law Review 253 (1959). We have already pointed out why that case did not involve a true merger situation (because of the intervening estate and because the two estates involved were not held in the same right). Nevertheless, the dicta in that case on the question of merger is the basis for the statements appearing in the above publications. The Texas cases involving merger, which are discussed in detail above, and which have been decided since Humphreys-Mexia v. Gammon, do not support the non-merger theory. It appears from these cases that when the question of merger of once severed mineral and surface estates that later come together in the same ownership is squarely put to a Texas court, it holds that a merger has occurred. Language indicating a contrary view in

5. Ledbetter, Mortgages on Land Affecting Subsequent Mineral Interests, 32 Texas Law Review 740, 743 (1954).

some of the cases, is, in the main, dicta, which is not necessary for the decisions of those cases, or else the cases can be distinguished on the facts from cases involving pure merger of the two estates.

We can conclude from the Texas cases that the better view in that state supports the merger doctrine where all the necessary elements are present and there are no intervening or disqualifying circumstances that prevent its application.

Under the facts and circumstances of our case, the mineral estate and the surface estate must be considered for tax purposes as one fee simple estate. This is true whether you say they were never separated, or, if separated, they were "reunited," as in West v. Hapgood, supra, or "merged" as in Jones v. McFaddin, supra, and Sharp v. Fowler, supra, and other cited merger cases, or were joined together by "unity of possession" in the same ownership (that of plaintiffs). Accordingly, even if the minerals became worthless, the remainder (the surface) still had value. Consequently, there was only a shrinkage in the total value of the estate which did not entitle the plaintiffs to take the deduction in their income tax for reasons already discussed.

V

*The Interests of the Lessor and Lessee In a Texas Oil and Gas Lease*

The plaintiffs contend that even if there was never any severance of the minerals and the surface in our case, or if there was a severance and later a merger of the two estates before the occurrence of the alleged loss here, they are still entitled to judgment for the loss of their mineral estate on the basis of Pool v. United States, 119 F.Supp. 202, 127 Ct.Cl. 549 (1954). That case involved a claim by a taxpayer of a loss on his income tax by reason of a royalty interest which he had reserved when he granted an oil and gas lease becoming worthless when the lessee drilled a dry hole and cancelled the lease. Our court held that he was entitled to recover for the loss of his reserved royalty interest.

Before discussing the facts in that case and its relevancy to the case at bar, perhaps it would be well to first consider the property rights of a lessor in Texas who reserves a royalty interest in the minerals when he gives an oil and gas lease on his land, as well as the property rights of the lessee in such a lease.

The usual and customary oil and gas lease in Texas reserves a one-eighth interest in the minerals (oil and gas) to the lessor. This is known as "royalty." The lessee is granted a seven-eighths interest in the oil and gas, and this is known as the "working interest." If, upon drilling one or more wells, oil or gas is discovered in paying quantities, the lessor gets one-eighth of all of the oil and/or gas that is produced and the lessee gets seven-eighths of it. But here we are interested primarily in the kind of an estate that the lessor and the lessee each get in the land and what effect the lease has on separating the mineral estate from the surface estate. The law on this question has developed in Texas along with the development of the oil and gas industry. We will first consider the interest of the lessee.

Some of the early cases held that an oil and gas lease did not vest an interest in land in the lessee, but was merely a contract for an option by which the lessee might acquire such an interest. National Oil & Pipe Line Co. v. Teel, 95 Tex. 586, 68 S.W. 979 (1902). Later on, it was decided that a lessee obtained a defeasible fee title in the minerals. Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717, L.R.A. 1917F, 989 (1915). This was reaffirmed in the cases of Stephens County v. Mid-Kansas Oil § Gas Co., supra; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27 (1929); and Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 99 A.L.R. 1107 (1935). These cases held that the lessee obtained a determinable fee in the mineral estate separate from the surface, which was an interest in the land.

In the meantime, the case of Ehlinger v. Clark, 117 Tex. 547, 8 S.W.2d 666

(1928) caused some confusion by indicating that the entire mineral estate was separated from the surface and passed to the lessee in an oil and gas lease. This question was decided otherwise by the Supreme Court of Texas in the case of Sheffield v. Hogg, 124 Tex. 290, 77 S.W. 2d 1021 (1934). There the court held that it was firmly settled that the entire mineral estate was not separated from the surface and did not pass to the lessee, but that the lessee had a determinable fee in the oil and gas in place to the extent granted him in the lease (which is usually a seven-eighths interest); and the royalty (usually one-eighth) reserved to the grantor is a fee simple interest in the land to that extent.

The law with respect to the interest of the lessor in Texas oil and gas leases has also undergone development in the decided cases with that pertaining to the interest of the lessee. Some of the early cases held that a lessor who reserved a royalty interest in an oil and gas lease merely had the right to receive money from the production of oil and gas and this was personalty and not an interest in the land. See Ehlinger v. Clark, supra; Continental Supply Co. v. Texas Co., 7 S.W.2d 174 (Tex.Civ.App. 1928), aff'd, 18 S.W.2d 602 (Com.App. 1929). The Supreme Court of Texas settled the question in Sheffield v. Hogg, supra, where it held that the lessor's royalty estate in the usual oil and gas lease was a fee simple interest in the land, regardless of how the lease provides the lessor is to receive his royalty in case of production from the land.

Regardless of any confusion or conflicts which may have existed in the early Texas cases as to the rights, interests, and estate of a lessor in connection with an oil and gas lease, the law is now definitely settled and correctly announced by the Supreme Court of Texas in the case of Thompson v. Thompson, 149 Tex. 632, 236 S.W.2d 779 (Tex. 1951). There the court said:

In discussing the nature of a mineral royalty this Court said in the case of Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, 476: "We think it is settled by the decisions of this Court and of this State that a contract affecting land in this State, granting or reserving mineral royalty in such land, constitutes such royalty real property. Stated in another way, a contract affecting land in this State, which grants or reserves mineral royalty in such land, constitutes the owner of such royalty the owner of an estate in such land. Sheffield v. Hogg (Federal Royalty Co. v. State), 124 Tex. 290, 77 S.W.2d 1021, 80 S.W.2d 741; Sheppard v. Stanolind Oil & Gas Co., Tex.Civ.App., 125 S.W.2d 643, writ refused; W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W. 2d 27; State National Bank of Corpus Christi v. Morgan, 135 Tex. 509, 143 S.W.2d 757; O'Connor v. Quintana Petroleum Co., 134 Tex. 179, 191, 133 S.W.2d 112, 134 S.W.2d 1016. It is also settled by our decisions that mineral royalty affecting land in this State, granted or reserved, 'and however payable—whether in the specific product (in oil or in money measured by the value of the product,' is an interest in the land covered by the contract. Sheppard v. Stanolind Oil & Gas Co., supra, 125 S.W.2d 649; Sheffield v. Hogg (Federal Royalty Co. v. State) supra."

See also the note in 101 A.L.R. beginning on page 884, and in 131 A.L.R. 1371. State National Bank of Corpus Christi v. Morgan, 135 Tex. 509, 143 S.W.2d 757.

We believe that the case of Evans v. Mills, 5 Cir., in 67 F.2d 840, applies the correct principle of law applicable to the homestead interest which petitioner, Edna Thompson, has in the oil royalty reserved. All of the contentions urged by the respondents in this cause were urged in Evans v. Mills, and Judge Hutcheson discusses each and every one of them, and holds that the lessors have a homestead interest in the royalty interest reserved under an oil and gas lease in Texas. Evans v. Mills is expressly relied upon by

Judge Greenwood in Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, loc. cit. bot. 1st col., 1028, and the Court says: "Circuit Judge Hutcheson, in the case of Evans v. Mills et ux., 5 Cir., 67 F.2d 840, was squarely confronted with the necessity to determine whether 'a standard oil and gas "unless" lease * * * for a primary term of ten years, and as long thereafter as oil or gas is produced by the lessee, providing for a money rental during the primary term of $47 annually in default of drilling *and reserving a one-eighth royalty,*' left in the lessors using the leased premises for the purposes of a residence homestead any mineral estate in land, which could be conveyed only as in land constituting the family homestead. In adjudging that the lessors continued to have title to an interest in land, Judge Hutcheson rejected as 'mistaken' the argument that the effect of the lease reserving the one-eighth oil royalty was to convey away entirely all their present estate in the minerals, upon consideration of the royalty to be paid *as personalty* for part of the oil the lessee severed and brought up, and *by way of money* for the gas, leaving in plaintiffs no right, title, or interest in the minerals in place, except the possibility of reverter, and working an abandonment of the homestead as to these contingent interests. The opinion then declares that the lessors' interest, including the one-eighth mineral royalty, 'does not pass to the lessee, *it remains owned as realty by the lessor,*' citing the Waggoner Estate Case [Waggoner Estate v. Wichita County], 273 U.S. 113, 47 S.Ct. 271, 71 L.Ed. 566; Hager v. Stakes, Tax Collector, supra [116 Tex. 453, 294 S.W. 835]; and others, including Reynolds v. McMan Oil & Gas Co., supra [Tex.Com.App., 11 S.W.2d 778]." Id. at 784-785.

In the case of Evans v. Mills, supra, cited by the Supreme Court of Texas in the *Thompson* case, supra, the court said:

We take up first and reject as mistaken the assumption the argument proceeds on, that the lease conveyed, not seven-eighths, but the whole of the minerals in place; that the one-eighth royalty interest was merely a personal right, and not a part of the realty reserved and excepted out of the conveyance. Notwithstanding expressions in Ehlinger v. Clark, 117 Tex. 547, 8 S.W.2d 666, apparently to the contrary, in Texas such an interest is excepted out of, it does not pass to the lessee, it remains owned as realty by the lessor. Waggoner Estate v. Wichita County, 273 U.S. 113, 47 S.Ct. 271, 71 L.Ed. 566; Hager v. Stakes, 116 Tex. 453, 294 S.W. 835; Boone v. Bassham (Tex.Civ.App.) 51 S.W.2d 1065; Jackson v. United Producers' Pipe Line Co. (Tex.Civ.App.) 33 S.W.2d 540; Reynolds v. McMan Oil & Gas Co. (Tex.Com.App.) 11 S.W.2d 778, 780, where it is said, "Waggoner v. Wichita County, 273 U.S. 113, 47 S.Ct. 271, 71 L.Ed. 566, and Hager v. Stakes, 116 Tex. 453, 294 S.W. 835, do affirmatively decide that the extent of the estate granted in such instruments is the oil and gas, less the exception contained in the royalty clause, which exception is real estate and remains the property of the lessor." * * * Id. at 841

The statement of the court in Davis v. Atlantic Oil Producing Co., 87 F.2d 75, 76 (5th Cir. 1936) is in point here:

The laws of Texas control the solution of the questions here presented. There, oil and gas in place is real property, and a part of the corpus of the property itself. Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717, L.R.A.1917F, 989; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; Evans v. Mills (C.C.A.) 67 F.2d 840. The royalty interest retained under an oil and gas lease is real property. Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, 80 S.W.2d 741; Evans v. Mills, supra.

It is settled in Texas that an oil and gas lease results in a severance of the minerals granted to the lessee from the surface estate. Texas Co. v. Daugherty, supra; Stephens County v. Mid-Kansas Oil & Gas Co., supra. As stated above, the usual and customary lease reserves a royalty interest of one-eighth to the lessor and grants a working interest of seven-eighths to the lessee. Accordingly, the seven-eighths working interest in the mineral estate is separated from the surface estate still owned by the lessor. The one-eighth royalty interest is not separated from the surface estate because it has never been conveyed by the lessor. It remains in the lessor. Sheffield v. Hogg, supra; Hager v. Stakes, 116 Tex. 453, 294 S.W. 835, 840 (1927); Waggoner Estate v. Wichita County, 273 U.S. 113, 47 S.Ct. 271, 71 L.Ed. 566 (1927).

With this background, we will now proceed to discuss the *Pool* case, supra, to determine whether the decision in that case governs in any way the decision in this case. The plaintiffs in that case were the executors of the estate of Joseph T. Sneed, Jr., who had died in October 1940. At the time of his death, Mr. Sneed owned a one-half interest in a large tract of land situated in Dallam County, Texas, and the land was subject to a 10-year oil and gas lease which had been granted in March 1940 to the Pure Oil Company. The oil and gas lease reserved to the lessors a one-eighth royalty interest; and after Mr. Sneed's death, his estate owned one-half of this royalty interest. In making an assessment for estate tax purposes, the Government placed a valuation of $2.50 an acre on the one-half royalty interest.

In 1944, the Pure Oil Company drilled a well in the northeast corner of the Dallam County land. Granite was encountered at a depth of 6,779 feet, and the hole was plugged. On March 5, 1945, the Pure Oil Company surrendered and cancelled the oil and gas lease on the land.

The Sneed estate paid an income tax of more than $36,000 for 1945. Later, the executors of the estate filed a timely claim for a refund, claiming that the estate's mineral interest in the Dallam County land had become worthless in 1945, and that the estate was entitled to take a loss deduction calculated at the rate of $2.50 per acre. The claim for refund was disallowed by the Internal Revenue Service, and the executors then sued in the Court of Claims.

The court held that the plaintiffs were entitled to recover because there had been a severance of the mineral estate from the surface estate. In that case, the plaintiffs were claiming a loss of their one-sixteenth interest in the royalty which had been reserved by the lessor and, according to Texas law detailed above, had never been severed from the surface estate. The only mineral interest that had been severed from the surface was the seven-eighths working interest conveyed as a determinable fee to the lessee in the oil and gas lease which was not involved in the case. Yet, the court allowed the lessors to recover for the loss of their royalty interest which had never been severed from the surface. From this, the plaintiffs in the instant case reason that they, too, are entitled to recover for the loss of their mineral interest even if there had been no severance in this case, or if there was a severance and a merger occurred before the loss.

The defendant in the case at bar argues that the *Pool* case is wrong because there was no severance of the royalty from the surface. It cites Price v. United States, 260 F.Supp. 18 (W.D.Okla., 1966) in support of this argument. In that case, the court said that the decision in *Pool* was wrong:

* * * by giving consideration to the separate valuations made by the Government for estate tax purposes, in treating non-separated minerals the same as separated minerals for tax loss purposes and in its conclusion that General Counsel Memorandum 3890 applies to non-separated mineral rights. * * * Id. at 21.

Notwithstanding the holding in the *Price* case, supra, we conclude that the *Pool* case can be distinguished from the instant case, because in the *Pool* case when the government separately valued the royalty interest of Sneed, the lessor, and the surface, it effectively severed the minerals from the surface, *for estate tax purposes*, and when the royalty became worthless, the plaintiffs were entitled to recover what the government had collected in taxes on what turned out to be worthless property. This was true in spite of the fact that such separate valuation of the royalty by the government did not sever the royalty from the surface under Texas law. The case should be limited to situations of that kind. We do not have the same facts in the case at bar.

## VI

*No Severance of The Minerals Occurs When an Oil and Gas Lease is Given as Security for a Debt*

The plaintiffs argue that there was a severance of the surface from the mineral interest granted to the lessee in an oil and gas lease executed by them to one J. P. Rice as security for a loan. It is true that Frank G. Hill and wife, who were then the fee owners of tract 2, granted what was an oil and gas lease in form to J. P. Rice on July 30, 1960. However, that instrument was issued to Mr. Rice as security for a loan which he had made to the Hills and it was not expected that Mr. Rice would actually proceed to drill for oil and gas on tract 2. Instead, the agreement between the Hills and Mr. Rice was to the effect that, upon the repayment of the loan secured by the oil and gas lease, Mr. Rice would relinquish or assign the lease to the Hills or their nominee. Later on, when the loan was repaid at about the time of the sale of tract 2 by the Hills to Mr. Henley and wife, Mr. Rice surrendered and assigned to the Henleys the security instrument which he had received from the Hills.

This instrument did not sever the minerals (any of them) from the surface for at least two reasons. First, it was given as security for the repayment of borrowed money and was actually a mortgage although an oil and gas lease on its face. As was quoted by the Supreme Court of Texas in Bradshaw v. McDonald, 147 Tex. 455, 216 S.W.2d 972, 974 (1949):

'* * * The character of the transaction is determined, not by the form of the contract, or the name given it by the parties, but by their real agreement and intention, and the construction which the law affixes thereto. [Citations.] If the conveyance is in fact designed as a security for the payment of money, equity treats it as a mortgage.'

See Continental Supply Co. v. Texas Co., supra. The situation is much like that which exists where a deed is given to secure a debt, and, even though it is absolute on its face, it is in fact a mortgage. See Kokernot v. Gilstrap, 143 Tex. 595, 187 S.W.2d 368 (Tex.1945); Wilbanks v. Wilbanks, 160 Tex. 317, 330 S.W.2d 607, 608 (1960).

In the second place, when Rice assigned the alleged lease to plaintiffs, the interest created by the lease reverted to plaintiffs and merged with their title to the surface and remainder of the mineral estates. See W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27, 32 (Tex.1929); Frick-Reid Supply Corp. v. Meers, 52 S.W.2d 115, 119 (Tex. Civ.App.1932).

Accordingly, we hold that the oil and gas lease given by plaintiffs to Rice was nothing but a mortgage and never became valid as an oil and gas lease. If, *arguendo*, it could be said to have any value as a lease, it merged with plaintiffs fee simple title when it was assigned to them and was thereby extinguished.

## VII

*Conclusion*

Based upon the foregoing, the plaintiffs are not entitled to take a loss deduction for 1961 with respect to tract 2 under Section 165(a) of the 1954 Code. Therefore, the plaintiffs are not entitled to recover, and the petition is dismissed.